**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE BOSTON SCIENTIFIC CORPORATION SECURITIES LITIGATION | Case No. 1:26-cv-40075-JEK<br><br>CLASS ACTION<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .......... 2

II. JURISDICTION AND VENUE .......... 10

III. PARTIES .......... 11

A. Plaintiffs .......... 11

B. Defendants .......... 11

IV. ADDITIONAL BOSTON SCIENTIFIC PLAYERS (NOT DEFENDANTS) .......... 14

V. INTRODUCTION OF CONFIDENTIAL WITNESSES/FORMER EMPLOYEES OF BOSTON SCIENTIFIC .......... 14

VI. SUBSTANTIVE ALLEGATIONS .......... 16

A. Company Background .......... 16

B. EP Business Unit / U.S. Commercial Launch of FARAPULSE System .......... 18

C. WATCHMAN Device/LAAC device .......... 21

D. Defendants Concealed Underperformance by Pairing Products and Divisions, and by Giving Away Products .......... 22

E. Boston Scientific Rushed FARAPULSE to Market with Inadequate Training, Staffing, and Quality Controls .......... 24

1. FARAPULSE Was Launched Without Qualified Sales Leaders or Adequate Training of the Clinical Specialists .......... 24

2. Product Defects and Quality Failures Plagued the FARAPULSE System .......... 26

F. FARAPULSE's First-Mover Advantage Collapsed as Competitors Entered the PFA Market .......... 28

1. The PFA Competitive Landscape Shifted Decisively Against FARAPULSE .......... 28

2. Hospitals and Physicians Abandoned FARAPULSE for Competitors' PFA Systems—and Told Defendants the Reason Why .......... 30

3. The OPAL Mapping System Was Inferior to Competitors' Mapping Systems .......... 36

G. Market Share Losses Were Tracked and Discussed Internally in Real Time .......... 38

H. Defendants Were Personally Informed of FARAPULSE's Competitive Collapse and Dismissed Warnings .......... 42

1. Former Employees Repeatedly Warned Defendants, Including Spadea-Anello and Fitzgerald, that FARAPULSE Was Losing to Affera ..... 42

2. Customers Told Defendants Directly at Industry and National Meetings That They Preferred Affera Over FARAPULSE..... 44

VII. DEFENDANT MAHONEY ENGAGED IN INSIDER TRADING IN VIOLATION OF SECTIONS 10(b) AND 20A OF THE EXCHANGE ACT BY SELLING MORE THAN $15 MILLION WORTH OF BOSTON SCIENTIFIC COMMON STOCK WHILE IN POSSESSION OF MNPI ..... 46

VIII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ..... 49

A. May 28, 2025: Bernstein Strategic Decisions Conference ..... 50

B. July 23, 2025: Q2 2025 Financial Results ..... 53

C. August 1, 2025: Q2 2025 Form 10-Q ..... 56

D. September 30, 2025: Boston Scientific 2025 Investor Day Conference ..... 57

E. October 22, 2025: Q3 2025 Financial Results ..... 61

F. November 3, 2025: Q3 2025 Form 10-Q ..... 63

G. November 18, 2025: Wolfe Research Healthcare Conference..... 63

H. December 2, 2025: Citi Annual Global Healthcare Conference..... 64

I. January 13, 2026: J.P. Morgan Healthcare Conference ..... 65

IX. THE TRUTH IS REVEALED..... 67

X. ADDITIONAL ALLEGATIONS OF SCIENTER ..... 72

A. Statements by Former Employees Corroborate That Defendants Knew or Recklessly Disregarded the Falsity of Their Statements and Omissions at the Time Such Statements Were Made ..... 74

B. Defendant Mahoney's Suspiciously Timed Stock Sale Two Days Before the Alleged Corrective Disclosure ..... 76

1. Defendant Mahoney's February 2, 2026 Sale Was Suspiciously Timed and Executed Two Days Before the Corrective Disclosure..... 77

2. Defendant Mahoney's Trading Plan Was Adopted During the Class Period, Undermining Its Protective Value..... 78

C. Defendants Repeated Statements Touting Their Confidence That Boston Scientific's EP Business Unit Would Continue Its Strong Growth, and That Its PFA Offerings Were Insulated from Competitive Pressures..... 79

D. The EP Business Unit Was at the Core of Boston Scientific's Business, and the Individual Defendants Spoke Frequently About Its Importance..... 81

XI. LOSS CAUSATION .......... 83

XII. CLASS ACTION ALLEGATIONS .......... 84

XIII. PRESUMPTION OF RELIANCE .......... 86

XIV. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE .......... 88

XV. CLAIMS FOR RELIEF .......... 89

COUNT I FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10B-5, PROMULGATED THEREUNDER, AGAINST ALL DEFENDANTS .......... 89

COUNT II FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS .......... 92

COUNT III FOR VIOLATION OF SECTION 20A OF THE EXCHANGE ACT AGAINST DEFENDANT MAHONEY .......... 93

XVI. PRAYER FOR RELIEF .......... 95

XVII. JURY DEMAND .......... 95

Court-appointed Lead Plaintiff Indiana Public Retirement System ("INPRS") and Additional Named Plaintiffs Miami Fire Fighters' and Police Officers' Retirement Trust ("Miami FIPO") and Detroit General Retirement System ("GRSD," together with INPRS and Miami FIPO, "Plaintiffs"), by and through their undersigned counsel, bring this securities class action for violations of Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (15 U.S.C. § 78a et seq., the "Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), against Defendants Boston Scientific Corporation ("Boston Scientific" or the "Company"), Michael F. Mahoney ("Mahoney"), Jonathan R. Monson ("Monson"), Kenneth M. Stein ("Stein"), Joseph M. Fitzgerald ("Fitzgerald"), and Nicholas Spadea-Anello ("Spadea-Anello," and together with Mahoney, Monson, Stein, and Fitzgerald, the "Individual Defendants," and collectively with Boston Scientific, the "Defendants"), on behalf of themselves and all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of Boston Scientific during the period from May 28, 2025 through February 3, 2026, inclusive (the "Class Period"), and were damaged thereby (collectively, the "Class").

Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based upon, among other things, the investigation conducted by and through counsel, which included review and analysis of: (a) Boston Scientific's public filings with the U.S. Securities and Exchange Commission ("SEC"); (b) press releases and other publications disseminated by Defendants and other parties; (c) news articles, shareholder communications, transcripts of conference calls and investor conferences, and postings on Boston Scientific's website; (d) other publicly available information concerning the Company and the Individual Defendants; (e) securities analyst reports about Boston Scientific; (f) interviews with former employees of

Boston Scientific ("Former Employees" or "FEs") with knowledge of the matters alleged herein;[1] and (g) consultation with experts in the areas of damages and loss causation. Plaintiffs believe that substantial additional evidentiary support for their allegations will be developed after a reasonable opportunity for discovery, as many of the facts are known only by Defendants, or are exclusively within Defendants' possession, custody, or control.

## I. INTRODUCTION

1. This securities class action arises from Defendants' material misrepresentations to investors about the Company's most critical growth engine: its FARAPULSE Pulsed Field Ablation ("PFA") system within its Electrophysiology ("EP") business unit. Before Defendants even began misleading investors, they knew the truth: FARAPULSE's early success was not the product of superior technology—it was the temporary benefit of being first to scale in the U.S. PFA market and that advantage had already eroded. Internally, Defendants had projected the Company would lose 20 PFA market share points across the U.S. to its competitor, Medtronic, and by spring 2025—right before the Class Period began—that projection had come to fruition, as one former employee estimated that Boston Scientific had already lost 20% of its PFA share across the U.S. Yet, throughout the Class Period, Defendants repeatedly assured investors that FARAPULSE was the clear market leader and insulated from competitive pressure. Time and time again, when analysts asked pointed questions about the competitive threat to FARAPULSE, Defendants either dodged the question or answered with assurances they knew—from their own internal projections, communications with their sales teams, and direct customer feedback—to be false.

[1] Former Employees will be identified herein by number: FE-1, FE-2, FE-3, etc. All FEs will be described in the masculine to protect their identities.

2. Boston Scientific is a global medical devices company headquartered in Marlborough, Massachusetts. During the Class Period, the Company's growth was overwhelmingly concentrated in its Cardiovascular segment, which accounted for at least 60% of revenue and experienced growth in organic net sales at more than three times the rate of MedSurg, the Company's other segment. Within Cardiovascular, the FARAPULSE franchise mattered most: after launching FARAPULSE commercially in the U.S. in late January 2024, EP revenue exploded from $800 million in fiscal year 2023, to $1.904 billion in fiscal year 2024, to $3.325 billion in fiscal year 2025—more than quadrupling in two years. But unbeknownst to investors, this growth was unsustainable.

3. PFA is a catheter-based cardiac ablation technology that uses short, high-voltage electrical pulses to destroy heart tissue causing abnormal heart rhythms, particularly atrial fibrillation ("AF" or "AFib"), without the collateral damage associated with traditional thermal ablation methods.

4. FARAPULSE's first-mover advantage collapsed even before the Class Period began. Medtronic's Affera Mapping and Ablation System ("Affera")—a dual-energy platform delivering both PFA and Radiofrequency ("RF") ablation—received FDA approval in October 2024, and Johnson & Johnson's VARIPULSE followed in November 2024. Even before Affera launched, Medtronic conducted presales for Affera and engaged with key FARAPULSE customers. And once Affera launched, Boston Scientific's sales were impacted "immediately" and the Company's PFA share took "massive hits." Hospitals viewed FARAPULSE as a temporary placeholder, rather than a superior long-term solution, and told the Company so directly. Former employee allegations detail that physicians and hospitals quickly recognized Affera offered features FARAPULSE lacked, including dual-energy capabilities, a fully integrated mapping

system, and a comprehensive catheter portfolio. Indeed, the growth story Defendants sold to investors had already unraveled.

5. Former employees provide extensive, first-hand information detailing how Boston Scientific rushed to monetize its temporary first-mover advantage before competition eroded its market share. One former employee explained that FARAPULSE was ill equipped to launch and was not set up for success, lacking the right contracts and sales leaders with the required capital sales experience. Another former employee described training as rushed and insufficient because the Company's priority was getting as many people in procedure rooms as quickly as possible so that physicians could use FARAPULSE (a Boston Scientific representative had to be present for a physician to use the device). In mid-2024, hospitals in one former employee's territory told Boston Scientific they would not invest in additional FARAPULSE systems after the FDA approved Medtronic's Affera. Some hospitals used FARAPULSE only because Boston Scientific provided the system free of charge. In summer 2025, Affera had taken a significant number of accounts from Boston Scientific, and that number continued to increase through fall 2025. Significantly, Boston Scientific tracked which hospitals switched from FARAPULSE to Affera, and that information was shown to Company executives.

6. Internally, Company executives admitted that Medtronic sold twice as many Affera systems in 2024 as Boston Scientific projected it would. Boston Scientific had also projected that it would lose 20 PFA market share points across the U.S. to Medtronic within the first 12 months after Affera launched—a projection discussed in internal EP strategy meetings attended by senior leaders, including Defendants Fitzgerald and Spadea-Anello, and a projection that Defendant Mahoney was aware of. And, by spring 2025—immediately prior to the Class Period—that

projection came to fruition: one former employee estimated that Boston Scientific had already lost approximately 20% of its PFA share across the U.S. to Affera.

7. In addition, employees told area vice presidents that FARAPULSE was losing market share to Affera, and one former employee was told that this information was reported to Defendant Mahoney. That same former employee repeatedly met with Defendant Spadea-Anello and told him that FARAPULSE was losing market share to Affera. Quarterly Sales Meetings attended by Defendant Fitzgerald and Defendant Spadea-Anello, among others, included discussions of customers' preference for Affera over FARAPULSE. And, in April 2025—before the Class Period even began—at an annual meeting described as the "Super Bowl for EPs," customers told Defendant Mahoney and Defendant Fitzgerald directly that they did not want Boston Scientific's mapping system or catheter portfolio and preferred Affera over FARAPULSE.

8. To conceal the scope of competitive erosion from investors, Defendants engaged in a scheme to mislead investors and artificially inflate the Company's stock. Rather than disclose what was happening—that FARAPULSE was losing ground to newly launched competitors—Defendants repeatedly assured investors that FARAPULSE's dominant leadership and growth were continuing unabated. Defendants did not merely report historic growth; they represented that FARAPULSE's clinical profile, first-mover lead, OPAL cardiac mapping system integration, expanding catheter portfolio, and FARAPULSE's connection to the Company's WATCHMAN left atrial appendage closure ("LAAC") device used in "concomitant procedures" (combined FARAPULSE ablation and WATCHMAN implantation performed in a single session) were allowing Boston Scientific to continue to take share, preserve PFA leadership, and remain the overall EP leader—even as, behind the scenes, physicians and hospitals were abandoning FARAPULSE for competing systems and telling the Company they were doing so.

9. Importantly, Defendants' public statements were not generic expressions of optimism; they were specific, factual assurances aimed squarely at competitive risks Defendants privately knew had already materialized. Defendants' assurances were often in direct response to analysts' pointed questions about FARAPULSE's ability to withstand new entrants and competition. Rather than disclose the truth, Defendants responded to these questions by allaying any concerns about competition.

10. For example, on the first day of the Class Period (May 28, 2025), an analyst asked how "FARAPULSE perform[s] as comps get tougher," to which Defendant Stein responded that the AFib market was "***effectively infinite in size***," and that there was a "***huge runway for a lot of growth***." In response to another analyst question, Stein represented that the "***only rate-limiting factor to growth***" was "***lab capacity***"—not competition or customers' preference. That same day, when Defendant Mahoney was asked to "talk[] about the competitive landscape," he dismissed any concerns outright, stating that Boston Scientific's "***competitive position is stronger now than we thought it would be 15 months ago***," and that the Company had "***the lion's share of the lead***."

11. Two months later, on the July 23, 2025 Q2 2025 Earnings Call, an analyst raised the very concern Defendants were concealing, stating that "a big concern that investors have is just competition coming in." Rather than address that concern, Defendant Mahoney pivoted to talk up growth, responding that Boston Scientific possessed "***unique advantages that are highly differentiated with FARAPULSE***," and that, even as market growth slows, EP "***will still be likely mid-teens growth and the largest, fastest-growing market in med tech***."

12. Defendants' claims grew bolder at Boston Scientific's Investor Day on September 30, 2025. Defendant Fitzgerald proclaimed that Boston Scientific would "***outpace the market***" and "***continue to take share in the broad EP market***." Defendant Spadea-Anello echoed that

message, stating the Company "***really continue[s] to take more share across the world as we launch***." When an analyst pressed Spadea-Anello about Boston Scientific's share "within the PFA ablation catheter segment as competition increases," Spadea-Anello brushed the concern aside, responding only that "***we were first with PFA***," and that the other players "***came a little bit later***"—without disclosing that the Company was already losing market share at an accelerating pace. Pressed further about the "share dynamic in EP," Spadea-Anello avoided a direct answer, claiming instead that Boston Scientific was "***insulating***" itself from competition "***by having an entire ecosystem tied to our mapping system***." In the accompanying presentation, the Company stated that they "***[e]xpect [EP] to durably outpace market, capture share and aim to achieve leading market position***."

13. As competitive erosion continued through fall 2025, Defendants continued to mislead investors. On October 22, 2025, Defendant Mahoney told investors Boston Scientific expected to "***retain a strong leadership position in PFA, enabled by our innovative portfolio, expanding mapping and commercial resources and consistent data publications***," and that EP would be an "***outstanding performer in '26 and beyond***."

14. On December 2, 2025, an analyst asked Defendant Fitzgerald about the "changing competitive landscape" in EP, and rather than disclose the erosion Boston Scientific was already experiencing, Fitzgerald minimized the threat as "***par for the course***," stating that Boston Scientific had a "very good understanding of what competition we will face and in what time frame."

15. On January 13, 2026—just three weeks before the truth emerged—Defendant Mahoney stated that Boston Scientific was "***in a great position***," was, "***[c]learly, the PFA market share leader***," and had "***tremendous confidence***" in its "***leadership position***." When confronted

by a securities analyst about third-party data sets showing weaker EP sales growth in the fourth quarter of 2025, Defendant Mahoney dismissed the concern, stating that the Company was "***comfortable***" where it finished the year, and that "***there's lots of data that seems to run around that people get all antsy about. But I think we're pretty good at delivering on our commitments***."

16. The truth was revealed on February 4, 2026, when Boston Scientific reported fourth quarter and full-year 2025 results showing dramatic deceleration in sales of its most important growth driver. The Company issued first quarter 2026 organic net sales guidance of only 8.5% to 10% and full-year guidance of 10% to 11%—a steep step-down from the 15.8% organic net sales growth the Company reported for full year 2025.

17. Significantly, on the earnings call, Defendant Mahoney admitted that the share losses Defendants had downplayed were known and expected throughout the Class Period. When asked why EP had been flat sequentially even though management had been "pretty bullish" at prior investor meetings, Mahoney revealed that Boston Scientific had "**planned**" and "**expect[ed] to lose some share given competitive launches**" and its "**dominant market share position going into 2025**," and reiterated that the Company "**did anticipate that**"—despite prior assurances to the contrary during the Class Period. Mahoney further admitted that, "**with new entrants coming, it's not surprising that we lost some share**," revealing that Defendants knew their window for FARAPULSE growth was closing and concealed it from investors. Defendants also revealed they had internally forecasted slowing EP growth in the fourth quarter, stating: "**Actually, our results in Q4 exceeded our internal target**."

18. The market reacted swiftly. Boston Scientific's stock price plummeted from $91.62 on February 3, 2026 to $75.50 on February 4, 2026—a decline of approximately 17.6%, on unusually high trading volume, ***wiping out approximately $23.9 billion in market capitalization***

***in a single day,*** representing its largest single-day decline since July 2000. To date, the stock has not recovered.

19. Securities analysts expressed shock at the EP deceleration and questioned management's credibility. On February 4, 2026, Truist Securities reported that "all eyes were on US EP results," and that those results "ended up missing by a bigger amount vs. feared ($45M miss vs. what we suspect was willingness to tolerate something more like ~$20-$25M shortfall)." Significantly, Truist Securities expected the stock to react "mostly to the EP result" "especially coming off mgmt. commentary a few weeks ago (or at least the opportunity to offer more color on EP trends) at an investor conference and during the Penumbra [ ] transaction conference call." Deutsche Bank reported that "all the fears over the past 60 days about Farapulse losing share / market slowing have been proven true," that "[p]art of the aggressive selling today was natural as management was dismissive of Yipet data at conferences in December and then again in early January, however the dataset was proven correct," and that "confidence in management took a hit." Bernstein likewise reported that "[s]ome investors questioned management credibility" after "BSX's CEO tried to calm concerns last month" over "third-party data" that proved accurate. These reactions confirm that Defendants' prior assurances were material to Boston Scientific's valuation.

20. Defendant Mahoney also personally profited from the artificial inflation and/or artificial maintenance of the Company's common stock price. On February 2, 2026—just two days before Boston Scientific disclosed that (i) U.S. EP revenue had flattened, (ii) FARAPULSE had lost PFA market share, and (iii) further EP market share losses were expected—Mahoney sold 160,901 shares for proceeds of approximately $15 million. The timing was highly suspicious: by February 2, 2026, Mahoney knew the Company's fourth quarter and full-year 2025 results and the

adverse EP trends, particularly in FARAPULSE, that would be disclosed just two days later. Nor were Mahoney's sales insulated by his Rule 10b5-1 trading plan, as Mahoney adopted that plan in August 2025, ***during the Class Period***, while in possession of material nonpublic information ("MNPI") concerning FARAPULSE's deteriorating competitive position, the Company's internal projection that it would lose 20% of its PFA market share, and expected share price losses.

21. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Boston Scientific common stock, Plaintiffs and other Class members have suffered significant damages. This action seeks to recover those damages.

## II. JURISDICTION AND VENUE

22. The claims asserted herein arise under Sections 10(b), 20(a), and 20A of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), and §78t-1), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

23. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

24. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred, in substantial part, in this Judicial District. In addition, the Company's principal executive offices are located in this Judicial District.

25. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of a national securities exchange, the New York Stock Exchange ("NYSE").

## III. PARTIES

### A. Plaintiffs

26. Lead Plaintiff INPRS provides retirement, disability, survivor, and other benefits to more than 500,000 members in the state of Indiana. INPRS manages net assets of approximately $50 billion. As reflected in the attached PSLRA certification, INPRS purchased Boston Scientific common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

27. Additional Named Plaintiff Miami FIPO is a public pension fund that provides retirement benefits for firefighters and police officers for the city of Miami, Florida. Miami FIPO manages approximately $2 billion in assets for the benefit of over 4,000 members, including active and retired members and beneficiaries. As reflected in the attached PSLRA certification, Miami FIPO purchased Boston Scientific common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

28. Additional Named Plaintiff GRSD provides retirement, disability, and pension services for the non-uniformed employees of the city of Detroit, Michigan. GRSD has approximately 23,000 members and approximately $1.8 billion in assets under management. As reflected in the attached PSLRA certification, GRSD purchased Boston Scientific common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

### B. Defendants

29. Defendant Boston Scientific is a Delaware corporation with its principal executive offices located at 300 Boston Scientific Way, Marlborough, MA 01752. During the Class Period, the Company's common stock traded on the NYSE under the symbol "BSX."

30. Defendant Mahoney has served as Boston Scientific's President since October 2011, as the Chief Executive Officer ("CEO") and as a director since November 2012, and as the Chairman of the Board since May 2016. During his tenure as CEO, Mahoney signed Boston Scientific's annual reports and certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), stating that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to Boston Scientific's internal controls over financial reporting. Throughout his tenure as CEO, Mahoney participated in the Company's quarterly earnings conference calls, investor day presentations, and healthcare conferences described herein.

31. Defendant Monson has served as Boston Scientific's Executive Vice President and Chief Financial Officer ("CFO") since June 30, 2025. Previously, he served as Senior Vice President Investor Relations from March 2024 to June 2025. During his tenure as CFO, Monson signed Boston Scientific's annual reports and SOX certifications stating that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to Boston Scientific's internal controls over financial reporting. Throughout his tenure as CFO, Monson participated in the Company's quarterly earnings conference calls described herein.

32. Defendant Stein has served as Boston Scientific's Senior Vice President and Chief Medical Officer since February 2023. In this position, Stein served as the Company's senior medical and scientific voice for the EP business unit and its FARAPULSE system. Throughout his tenure as Chief Medical Officer, Stein spoke to market analysts and participated in the Company's quarterly earnings calls and healthcare conferences on the Company's behalf.

33. Defendant Fitzgerald has served as Boston Scientific's Executive Vice President and Group President of Cardiology since May 2022. In this position, Fitzgerald oversaw the Cardiovascular segment (Boston Scientific's largest business segment, which includes the EP

business unit). During the Class Period, Fitzgerald reported to CEO Mike Mahoney. Throughout his tenure as Executive Vice President and Group President of Cardiology, Fitzgerald spoke to financial analysts and participated in conferences on the Company's behalf.

34. Defendant Spadea-Anello has served as Boston Scientific's Executive Vice President, AF Solutions since January 2026. Previously, he served as Senior Vice President, Electrophysiology from January 2025 until January 2026. In his current and former positions, Spadea-Anello oversaw the EP business unit, the Company's primary growth driver during the Class Period (including oversight of FARAPULSE commercialization, competitive strategy, and market share performance). During the Class Period, Spadea-Anello reported to CEO Mike Mahoney. Throughout his tenure as Senior Vice President, Electrophysiology and as Executive Vice President, AF Solutions, Spadea-Anello spoke to financial analysts and participated in conferences on the Company's behalf.

35. The Individual Defendants possessed the power and authority to control Boston Scientific's course of business, as well as the contents of Boston Scientific's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Boston Scientific's SEC filings and press releases, alleged herein to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Boston Scientific and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions and fraudulent scheme and course of conduct pleaded herein.

## IV. ADDITIONAL BOSTON SCIENTIFIC PLAYERS (NOT DEFENDANTS)

36. During the Class Period, Samuel Conaway was President, U.S. Cardiology Sales. Conaway reported to CEO Mike Mahoney.

37. During the Class Period, Shawn Burke was EP VP of Sales, West Sector VP of Sales. Burke reported to CEO Mike Mahoney.

38. During the Class Period, Matt Risinger was Global Vice President and General Manager, WATCHMAN.

## V. INTRODUCTION OF CONFIDENTIAL WITNESSES/FORMER EMPLOYEES OF BOSTON SCIENTIFIC

39. This Complaint references numerous Former Employees that support Plaintiffs' allegations herein.

40. FE-1 was employed by Boston Scientific as an EP Clinical Specialist from before the Class Period through the end of the Class Period. FE-1 explained that he joined Boston Scientific in an east coast region around the time PFA launched, which he described as a highly competitive market. During his tenure, FE-1 reported to an EP Clinical Manager who reported to an Area Vice President. The Area Vice President reported to Sam Conaway.

41. FE-2 was employed with Boston Scientific Corporation from September 2024 to August 2025 as an AF Solutions Clinical Specialist. FE-2 advised that during his tenure, he managed EP and PFA accounts located in New York City and New Jersey and supported the following four sales representatives: former AF Solutions Territory Manager; current AFib Solutions Regional Director; current AF Solutions Territory Manager; and current Territory Manager. FE-2 advised that he was responsible for managing inventory, providing competitive information to his sales representatives and growing the EP and PFA business by stealing accounts from competitors.

42. FE-3 was employed by Boston Scientific as Territory Manager for years prior to the Class Period until the beginning of 2026. In his role, FE-3 was responsible for managing the accounts of 10-12 hospitals in a Western state.

43. FE-4 was employed with Boston Scientific Corporation from before the Class Period to September 2025, as a Regional Sales Director. FE-4 advised that as a Regional Sales Director, he managed sales and clinical representatives that sold Cardiology Group products in several states.

44. FE-5 was employed with Boston Scientific Corporation before the Class Period through the end of the Class Period, most recently as an AFib Solutions Territory Manager. FE-5 advised that during his most recent tenure, he was responsible for selling Boston Scientific's electrophysiology (EP), Access and WATCHMAN portfolios to hospitals. FE-5 explained that as an AFib Solutions Territory Manager, he was given a quarterly sales quota and that he was responsible for generating revenue for all three portfolios. FE-5 noted that he most recently reported to a regional sales director that reported to current Area Vice President Tim Schmitt.

45. FE-6 was employed with Boston Scientific Corporation from January 2025 to April 2026 as an AF Solutions Territory Manager. FE-6 advised that he was responsible for selling atrial fibrillation (AF) solutions to customers located in Northern Houston, Texas. FE-6 noted that he most recently reported to current Area Vice President Tim McGrail.

46. FE-7 was employed with Boston Scientific Corporation from before the Class Period to August 2025, most recently as an AF Solutions Territory Manager. FE-7 advised that as an AF Solutions Territory Manager, he sold capital equipment and Boston Scientific's electrophysiology (EP) portfolio to seven accounts located in the San Diego, California area. FE-7 stated that he most recently reported to current Area Vice President Corporate Accounts and

Healthcare Solutions Braden Weber. FE-7 noted that he departed Boston Scientific because the Company was "misleading everybody" about its EP business.

47. FE-8 was employed by Boston Scientific Corporation for years prior to the Class Period until Summer 2025, most recently as a Clinical Manager. FE-8 advised that as a Clinical Manager, he hired, trained, and developed the clinical team. FE-8 added that in 2024 and 2025, he was very involved in electrophysiology (EP) regional sales to customers. FE-8 stated that he most recently reported to an area vice president, who ultimately reported to current EVP and Group President, Cardiovascular, Joseph Fitzgerald.

48. FE-9 was employed with Boston Scientific Corporation for years prior to the Class Period through Spring 2025, with his most recent role in educational programs. Prior to that, FE-9 was employed in numerous sales roles. FE-9 noted that, while in the education role, he attended electrophysiology (EP) internal strategy meetings.

## VI. SUBSTANTIVE ALLEGATIONS

### A. Company Background

49. Boston Scientific is a global medical technology company that develops and manufactures devices used across various medical specialties. The Company's business model centers on selling capital equipment and disposable devices to hospitals and physicians, with much of its revenue derived from the recurring purchases of disposable devices used in medical procedures.

50. The Company operates through two reportable segments: MedSurg and Cardiovascular.

51. The Cardiovascular segment encompasses five business units:

a. EP, which develops and manufactures less-invasive medical technologies used in the diagnosis and treatment of rate and rhythm disorders of the heart;

b. WATCHMAN, which manufactures the WATCHMAN LAAC device designed to close the left atrial appendage in patients with non-valvular atrial fibrillation who are at risk for ischemic stroke;

c. Cardiac Rhythm Management, which develops and manufactures implantable devices that monitor the heart and deliver electricity to treat cardiac abnormalities;

d. Interventional Cardiology & Vascular Therapies, which develops and manufactures technologies to diagnose and treat complex coronary, peripheral, and venous diseases; and

e. Interventional Oncology & Embolization, which develops and manufactures products to treat various forms of cancer.

52. From 2023 to 2025, Cardiovascular was at least 60% of Boston Scientific's annual net sales:

| **Year** | **Total Net Sales** | **Cardiovascular Total Net Sales** | **MedSurg Total Net Sales** |
|---|---|---|---|
| 2023 | $14.24 billion | $8.82 billion (61.9%) | $5.42 billion (38.1%) |
| 2024 | $16.75 billion | $10.76 billion (64.2%) | $5.99 billion (35.8%) |
| 2025 | $20.10 billion | $13.25 billion (66%) | $6.83 billion (34%) |

53. Cardiovascular has been Boston Scientific's primary growth engine. From 2023 to 2024 net sales grew approximately 22%, from $8.82 billion to $10.76 billion, and from 2024 to 2025 net sales grew approximately 23%, from $10.76 billion to $13.25 billion.

54. For full year 2025, organic net sales growth in the Cardiovascular segment was more than three times the organic net sales growth rate of the MedSurg segment.

55. The Cardiovascular segment's growth was primarily driven by the EP business unit and its FARAPULSE system.

**B. EP Business Unit / U.S. Commercial Launch of FARAPULSE System**

56. During the Class Period, the EP market was described by Defendants as a "$13 billion market, largest in medtech and the fastest growing in medtech." The EP business experienced explosive revenue growth during, and immediately preceding, the Class Period, driven almost entirely by the commercial launch and adoption of the FARAPULSE PFA System in the United States in January 2024. Annual EP revenue grew from $800 million in fiscal year 2023 to $1.904 billion in fiscal year 2024, to $3.325 billion in fiscal year 2025—a more than four-fold increase in two years. U.S. EP revenue specifically grew from $370 million in 2023 to $1.256 billion in 2024, to $2.311 billion in 2025. Quarterly EP growth rates during the Class Period were staggering: EP sales grew 94% in the second quarter of 2025, 63% in the third quarter of 2025, and 35% in the fourth quarter of 2025, resulting in 73% organic net sales growth on a full year basis.

57. As described in the Company's 2025 Form 10-K, filed with the SEC on February 17, 2026, the Cardiovascular segment reported that net sales growth in both 2024 and 2025 "was primarily driven by growth of [Boston Scientific's] Electrophysiology business unit, led by [the Company's] Farapulse™ Pulsed Field Ablation (PFA) System." The Company further acknowledged that FARAPULSE drove increases in its selling, general, and administrative expenses ("SG&A"), noting that the increase in SG&A in both years "was driven by selling expenses associated with higher net sales and product launches, including the Farapulse™ PFA System in our Electrophysiology business unit." Thus, the trajectory of FARAPULSE and the EP

business was the single most important driver of the Company's growth narrative during the Class Period.

58. FARAPULSE is Boston Scientific's PFA system for the treatment of AFib, which it gained from a June 2021 acquisition of Farapulse, Inc. From 2021 to January 2024, FARAPULSE was available only in Europe.

59. AFib is the most commonly sustained cardiac arrhythmia, affecting millions of patients worldwide. AFib occurs when the upper chambers of the heart (the atria) beat irregularly due to disorganized electrical signals. Left untreated, AFib substantially increases the risk of stroke, heart failure, and death.

60. Cardiac ablation is a procedure used to treat AFib by creating lesions (scar tissue) in the heart to block the abnormal electrical signals causing the arrhythmia. PFA is a next-generation ablation technology that uses brief, high-voltage electrical pulses to create lesions in cardiac tissue. Unlike older, thermal ablation technologies (RF and cryoablation), PFA selectively targets cardiac cells while sparing surrounding structures such as the esophagus, phrenic nerve, and pulmonary veins. As a result, PFA offers a superior safety profile, greater predictability, and enables physicians to perform ablation procedures more quickly.

61. The FARAPULSE system received FDA approval on January 30, 2024, and was launched commercially in the U.S. immediately thereafter. Boston Scientific benefited significantly, as it was the first major PFA entrant in the U.S. market.

62. The FARAPULSE suite consists of several integrated components:

a. FARASTAR is the energy generator that powers the system;

b. FARAWAVE is the single-use ablation catheter used in every PFA procedure—a pentaspline catheter that can be configured into multiple shapes to deliver wide-area circumferential ablation, primarily for pulmonary vein isolation and posterior wall ablation;[2]

c. FARADRIVE is a steerable sheath used to guide the catheter to the treatment site;

d. FARAWAVE NAV is the second-generation version of the FARAWAVE catheter, which incorporates a magnetic navigation sensor enabling integration with Boston Scientific's OPAL HDx Mapping System for more precise catheter tracking and visualization during procedures;

e. The OPAL HDx Mapping System is a catheter-based, three-dimensional cardiac mapping and navigation system; and

f. FARAVIEW is the accompanying software module that provides dynamic visualization of the catheter and allows physicians to plan lesion placement.

63. Beyond FARAWAVE, the Company has expanded its catheter portfolio to include FARAPOINT—a single-point catheter with multiple electrodes designed for targeted, focal lesion delivery as a complement to FARAWAVE's broader ablation capability—and is developing

[2] A pentaspline catheter is a multipolar ablation device with five splines (arms or segments) that each contain multiple electrodes. In the case of the FARAPULSE pentaspline PFA system, each spline has four electrodes, giving a total of 20 ablation electrodes, which purportedly deliver short, high-intensity electric pulses to stop electrical signals without using heat.

FARAFLEX, a large focal mapping and ablation catheter designed for complex arrhythmias and ventricular tachycardia.

### C. WATCHMAN Device/LAAC device

64. WATCHMAN is Boston Scientific's LAAC device, designed for stroke prevention in patients with non-valvular atrial fibrillation. The device is implanted in the left atrial appendage to seal it off, preventing blood clots that form in the appendage from entering the bloodstream and causing a stroke. WATCHMAN provides an alternative to long-term blood thinner therapy for eligible AFib patients.

65. Unlike FARAPULSE, WATCHMAN is not built around a large capital console that a hospital must purchase first. The WATCHMAN technology consists of a WATCHMAN implant (the permanent implant device left in the heart), delivery system, and access system used during the catheter-based procedure. These are procedure-specific products, rather than a reusable capital platform, and revenue comes primarily from each implant procedure, creating a recurring, disposable-based business model. Thus, hospitals adopted WATCHMAN more easily than FARAPULSE, as it had minimal upfront capital investment compared with FARAPULSE.

66. WATCHMAN has historically been one of Boston Scientific's largest individual product franchises and a major driver of its Cardiology business. The Company reported WATCHMAN revenue of approximately $1.5 billion in 2024 and approximately $2 billion in 2025.

67. During the Class Period, Defendants promoted "concomitant procedures" that combined FARAPULSE ablation with WATCHMAN LAAC implantation in a single session. These combined procedures were a key driver of growth for both the EP and WATCHMAN businesses, as physicians could treat AFib *and* reduce stroke risk in a single procedure, rather than requiring patients to undergo two separate interventions.

### D. Defendants Concealed Underperformance by Pairing Products and Divisions, and by Giving Away Products

68. Boston Scientific engaged in a pattern of concealment—blending underperforming divisions with stronger ones to mask specific areas of weakness and giving away capital equipment to artificially sustain procedure volumes.

69. According to FE-9, the Company's EP business was not profitable from the time he joined Boston Scientific until December 2023. FE-9 stated that during this time, Boston Scientific aligned EP with the Cardiac Rhythm Management (CRM) division because CRM was growing and EP was not profitable. FE-9 explained that through December 2023, the Company blended CRM and EP's finances to hide the fact that CRM was financing EP. FE-9 detailed that through December 2023, EP "sucked" profits from CRM to keep EP afloat.

70. FE-9 stated that Boston Scientific separated the CRM and EP businesses in January 2024 to prepare for the FARAPULSE launch. According to FE-9, Boston Scientific was holding out hope for FARAPULSE and launched it earlier than expected.

71. FE-8 also reported that Boston Scientific paired different divisions together during his tenure to hide losses in specific divisions. For example, FE-8 detailed that at one point prior to 2024, the Company paired CRM and WATCHMAN with EP to hide EP losses under CRM and WATCHMAN and to keep EP afloat. FE-8 stated that senior vice presidents and the "Mahoney and Fitzgerald line of leadership" made the decision to pair different divisions together to hide losses in specific divisions. FE-8 stated that EP losses were not limited to a specific EP product, but included the entire EP portfolio, such as mapping systems and catheters. FE-8 noted that pairing divisions together to hide losses in specific divisions "happened routinely" and was part of Boston Scientific's culture.

72. FE-8 added that everyone at Boston Scientific talked about how the Company paired different divisions together throughout his tenure to hide losses in specific divisions and that this practice was well known within the Company. According to FE-8, Boston Scientific changed and rotated leaders within the Company every two years. FE-8 recalled that he was aware of the pairing divisions together as the Company would announce it internally and division leaders would be transferred to other divisions or terminated.

73. FE-8 explained that the Company determined which divisions were growing and which were losing market share based on the sales figures. FE-8 stated that everything was driven by sales. FE-8 recalled that Boston Scientific would pair products that were not selling well with products that were selling well in order for the former to be sold.

74. FE-8 recalled that Boston Scientific gave FARAPULSE systems to hospitals for free in exchange for market share agreements for WATCHMAN. According to FE-8, some hospitals still rejected FARAPULSE even though it was free.

75. FE-8 recalled that Boston Scientific also gave mapping systems to hospitals for free so that hospitals would purchase other products to pair with the mapping systems. FE-8 described this as being similar to a printing company giving away free printers to customers so that the customers would then purchase ink cartridges from the printing company.

76. FE-8 explained that selling EP products is much more intense than selling WATCHMAN because EP salespeople are tasked with convincing hospitals to purchase $250,000 of capital equipment as well as disposable products. FE-8 detailed that EP can still profit if capital equipment is given away to hospitals for free because the capital equipment gets Boston Scientific in the door with hospitals and then the Company makes money from selling disposable catheters to hospitals it gave capital equipment to for free.

77. FE-7 recalled that accounts did not want FARAPULSE even though they prepaid for it. FE-7 stated that Boston Scientific gave rebates to customers of WATCHMAN, a one-time implant for people with non-valvular atrial fibrillation (AFib) to reduce stroke risk. FE-7 explained that to prepare customers for FARAPULSE, the Company took money (sometimes up to $250,000) out of WATCHMAN rebates and used that money as payment for FARAPULSE. According to FE-7, some WATCHMAN customers that prepaid $250,000 for FARAPULSE did not want the system after it was launched because they preferred Affera or other PFA systems.

78. FE-7 stated that Boston Scientific also gave FARAPULSE to some customers at no cost. FE-7 explained that Boston Scientific did not charge customers for FARAPULSE if they ran 96 FARAPULSE cases in one year or 24 FARAPULSE cases per quarter.

## E. Boston Scientific Rushed FARAPULSE to Market with Inadequate Training, Staffing, and Quality Controls

79. Based on the accounts of several former employees, Boston Scientific hastily launched FARAPULSE in early 2024, without adequate preparation or training of both sales leaders and clinical specialists who were in the procedure rooms with the doctors, and rushed to capitalize on the Company's first-mover advantage before competitors entered the PFA market.

### 1. FARAPULSE Was Launched Without Qualified Sales Leaders or Adequate Training of the Clinical Specialists

80. FE-8 stated that when Boston Scientific launched FARAPULSE in January 2024, it was one of the only pulsed field ablation (PFA) systems on the market. However, FE-8 explained that FARAPULSE was ill-equipped to launch and was not set up for success. FE-8 detailed that FARAPULSE was not provided with the right contracts or given sales leaders with the required capital sales experience.

81. FE-8 recalled that WATCHMAN sales leaders were tasked with selling capital equipment from the EP portfolio, but these sales leaders did not have experience selling capital

equipment, and according to FE-8, selling capital equipment is a different process than selling WATCHMAN. FE-8 stated that these WATCHMAN sales leaders were not qualified to sell EP products.

82. FE-1 described the FARAPULSE training that he received as insufficient. FE-1 explained that when he joined the company, there were 4-5 hours of online modules to watch and answer questions. FE-1 stated that there was also in-person training, but that was to make sure employees completed their online modules and allow time for any questions. According to FE-1, there was some new material provided during the in-person training, but the manner in which the new material was presented was rushed and crammed into the training. FE-1 explained that after completing the modules, employees would shadow seven cases in the field and then "you were on your own," meaning employees would be expected to coach the physicians on how to use FARAPULSE during the procedures.

83. According to FE-1, Boston Scientific was rushing to profit from FARAPULSE because physicians could not complete the procedure with FARAPULSE unless a Boston Scientific employee was in the room during the procedure. FE-1 explained that training was rushed because Boston Scientific just wanted to get as many people in the room as quickly as possible so that physicians could use FARAPULSE. FE-1 stated that Boston Scientific even cross-trained employees from other sectors to get more people in the room and offered referral bonuses as an incentive.

84. According to FE-3, Boston Scientific had a "horrible business strategy" and "unrealistic expectations" to grow their market share for FARAPULSE. FE-3 elaborated and explained that Boston Scientific did not have proper employees, specifically Boston Scientific

lacked expert mappers and, in his opinion, without appropriate staff you could not fulfill customer needs once they purchased the FARAPULSE device.

85. FE-3 recalled expressing his concerns to management at Boston Scientific, including Patrick McCoy, Tim Schmitt, and Shawn Burke. FE-3 added that many of his concerns were about the sustainability of Territory Managers. FE-3 explained that prior to the launch of FARAPULSE, he was a Territory Manager for just WATCHMAN. But after FARAPULSE's launch, FE-3 explained that the Company took all of the WATCHMAN Territory Managers and added FARAPULSE "to their bags"—meaning that they would also be responsible for FARAPULSE. In FE-3's opinion, it was "unconscionable" to make one territory manager handle the entire business.

86. FE-3 recalled that he expressed frustrations to management, including Patrick McCoy, Tim Schmitt, and Shawn Burke, about Boston Scientific not having EP expertise in place when FARAPULSE launched. In FE-3's opinion, Boston Scientific was not properly or professionally trained to support a case using FARAPULSE.

### 2. Product Defects and Quality Failures Plagued the FARAPULSE System

87. According to FE-1, there was skepticism surrounding FARAPULSE because, even though there was clinical research behind the technology, it was new in the field. FE-1 explained that before the physician begins the procedure and places the device in a patient, the device must be tested to ensure that it is working properly. FE-1 recounted how during these tests, he would often find that the device or components of the device were not working properly.

88. FE-1 explained that FARADRIVE was the sheath used in the FARAPULSE device and FARAWAVE was the catheter used. According to FE-1, if the device or one of the components

was not working properly, he would inform the surgical technician working on prepping the device.

89. FE-1 stated that issues with the FARAPULSE device or components not working occurred "very often." FE-1 estimated returning 40-50 devices, which he said was a conservative estimate. FE-1 also recalled that if it was determined to be a "bad batch" of FARAPULSE devices, he would relay that information to the team, but according to FE-1, Boston Scientific never formally recalled any devices or components.

90. FE-1 elaborated that concerns with the FARAPULSE device were raised to direct managers. FE-1 added that he raised concerns about the FARAPULSE devices not working properly, training being insufficient, and employees not being comfortable with the training they received.

91. FE-1 recalled receiving a lot of complaints from physicians about FARAPULSE and that at least one device was sent back every day. FE-1 advised that when a complaint was received, he would fill out a form, including details about the issue and the case number to identify the physician on the case. FE-1 recalled that the complaint was then submitted to Boston Scientific's Quality Team and tracked through Salesforce. FE-1 explained that the majority of complaints received were about the sheath breaking and the catheter inverting.

92. FE-1 also explained that Boston Scientific came out with FARAWAVE 2.0 catheter because of the large number of complaints received about the first iteration of the catheter.

93. FE-1 stated that it was common for a patient to need a touch up or re-do procedure within 1 to 2 years after the initial procedure with FARAPULSE. However, FE-1 recalled how there was a problem unique to FARAPULSE – the device was ablating so much more tissue than competitor's devices, and patients were coming back with very complex arrhythmias. Because a

lot of tissue gets destroyed in the procedure with FARAPULSE, FE-1 explained that the re-do required mapping of the entire atria and made the procedure more complicated.

94. According to FE-1, subject matter experts worked as tech support to track the re-do cases in Salesforce. FE-1 recalled that corporate leadership had all the information relating to re-do procedures. FE-1 added that leadership did not care about the amount of re-do procedures because a re-do meant another case, which meant getting "back in the room," and thus, a chance to make more money.

### F. FARAPULSE's First-Mover Advantage Collapsed as Competitors Entered the PFA Market

95. FARAPULSE's initial dominance in the PFA market was a result of launch timing, not product superiority. Boston Scientific was the first major PFA system to market in the U.S., which gave FARAPULSE a temporary monopoly. But that advantage eroded almost immediately when competitors entered with superior platforms—including integrated mapping, dual-energy functionality, and better catheter technology.

96. As established by several former employee accounts, physicians quickly recognized these competitive advantages and began abandoning FARAPULSE in favor of Medtronic's Affera system and, increasingly, other entrants such as J&J's PFA system, VARIPULSE, which initially launched in fall 2024.

#### 1. The PFA Competitive Landscape Shifted Decisively Against FARAPULSE

97. Medtronic's PulseSelect was a PFA system that narrowly beat Boston Scientific's FARAPULSE to market, but physicians viewed PulseSelect unfavorably and preferred FARAPULSE.

98. Stronger competition soon emerged. Medtronic's second-generation PFA system, Affera, received FDA approval on October 24, 2024. Shortly after that, on November 7, 2024, the

FDA approved J&J's PFA system, VARIPULSE.[3] Then, on December 22, 2025, the FDA approved Abbott's system, Volt.

99. FE-3 explained that when competition began launching their PFA devices, physicians wanted to try the new technology. FE-3 further explained that J&J and Abbott were "main players" in the EP space and in his opinion, there was "no way for Boston Scientific to maintain market share." In FE-3's opinion, not having sufficient support, for example, trained employees, negatively impacted Boston Scientific because competition had more expertise and better service.

100. In terms of competition, FE-1 explained that Boston Scientific was the first to market with respect to PFA technology and FARAPULSE. FE-1 recalled J&J launching VARIPULSE in Fall 2024. According to FE-1, there were other methods of treating AFib, including RF (Radio Frequency) and cryotherapy. FE-1 stated that Medtronic was a big competitor in cryotherapy, and some other competitors were Abbott and J&J.

101. FE-9 explained that although FARAPULSE looked good on paper, there were always concerns internally about pulsed field ablation (PFA) competition. FE-9 stated that FARAPULSE and Medtronic's PulseSelect were the only two PFA systems on the market at the time when FARAPULSE launched in October 2024. FE-9 noted that Medtronic was "hot on our heels" because it was in the process of launching a new PFA system, Affera, with a new catheter called Sphere-9.

102. FE-4 recalled that FARAPULSE was initially successful because it was one of the first pulsed field ablation (PFA) systems on the market. According to FE-4, FARAPULSE's initial

[3] Biosense Webster, Inc. is a subsidiary of J&J, and references herein to Biosense Webster's PFA system, VARIPULSE, means J&J's PFA System, VARIPULSE.

success was tempered internally because the Company knew that competition would catch up. FE-4 noted that Boston Scientific wanted to launch FARAPULSE first to get a head start on PFA competition.

103. FE-8 explained that although sales of capital equipment take 12 months to finalize, he could see that FARAPULSE sales were on the decline at the time of his departure in summer 2025.

104. FE-8 stated that the East Coast of the United States typically adapted to changes in the medical device technology space before the West Coast did. FE-8 explained that if a product performed poorly on the East Coast, then the West Coast would subsequently experience that same trend (i.e., the product would perform poorly on the West Coast). FE-8 noted that it was not a good sign for the West Coast when FARAPULSE first lost market share on the East Coast in mid-to-late 2024. FE-8 stated that FARAPULSE subsequently lost market share on the West Coast.

### 2. Hospitals and Physicians Abandoned FARAPULSE for Competitors' PFA Systems—and Told Defendants the Reason Why

105. The competitive shift was not merely a matter of market projections—it was confirmed by feedback from hospitals and physicians who told Boston Scientific directly, in no uncertain terms, that they were waiting for Medtronic's Affera to launch in fall 2024 and immediately switching. Former employee allegations detail that FARAPULSE's customer base eroded across multiple regions, with key accounts defecting to competitors' platforms, including Medtronic and J&J.

106. FE-8 recalled that all hospitals in his region told Boston Scientific in mid-2024 that they would not invest in additional FARAPULSE systems after the FDA approved Medtronic's Affera. FE-8 recalled that several hospitals told him that they were only using FARAPULSE until Medtronic launched Affera and that they would switch from FARAPULSE to Affera as soon as

Affera was launched. FE-8 noted that some hospitals only used FARAPULSE initially because it was free.

107. FE-8 noted that although Affera was not approved by the FDA until October 2024, Medtronic conducted presales for Affera in 2024 before it received FDA clearance. FE-8 detailed that some customers told current Area Vice President Corporate Accounts and Healthcare Solutions when they initially purchased FARAPULSE that it was just holding them over until Affera was approved by the FDA, at which point they would no longer purchase FARAPULSE systems.

108. According to FE-8, Boston Scientific tracked which hospitals switched from FARAPULSE to Affera and this information was shown to Company executives.

109. According to FE-9, the PFA market changed and shifted away from FARAPULSE and toward Affera after Affera launched with Sphere-9 in October 2024. FE-9 noted that Medtronic engaged with key FARAPULSE customers prior to Affera's launch in October 2024.

110. FE-9 explained that Affera is a dual mapping and ablation system while FARAPULSE is only an ablation system and that Affera enables physicians to toggle between PF and RF energy while FARAPULSE can only utilize PF energy. Therefore, FE-9 stated that physicians preferred Affera because they saw the value in Affera's dual energy and versatility.

111. FE-9 explained that FARAPULSE overtreats atrial fibrillation because it removes healthy tissue. FE-9 noted that Affera is more economic and offers better procession [sic] so that physicians are not treating healthy tissue during procedures.

112. FE-3 recalled that the launch of Medtronic's Affera device took a lot of sales away from Boston Scientific and he recalled physicians loving the product. FE-3 added that Boston Scientific's sales were impacted "immediately" when Affera launched. FE-3 explained that all the

territory managers talked to each other about losing sales due to the competition. According to FE-3, territory managers across the country were scared because they were hearing that physicians preferred Affera and were going to switch from FARAPULSE to Affera.

113. FE-7 noted that although physicians initially liked FARAPULSE, he immediately knew that Boston Scientific was going to quickly lose PFA market share. For example, FE-7 detailed that Sharp HealthCare told him that as soon as J&J gets a proper catheter for its PFA system, it was going to switch from FARAPULSE to J&J's PFA system. FE-7 added that in 2025, Abbott was preparing to launch its PFA system Volt, which he knew would take additional PFA market share from FARAPULSE. Therefore, FE-7 stated that the "writing was on the wall."

114. According to FE-7, FARAPULSE lost additional PFA market share once Medtronic launched its second PFA system Affera, which obtained a "windfall of business." FE-7 stated that Scripps Health was at one point the number one FARAPULSE site in the United States. However, FE-7 detailed that Scripps preferred Affera over FARAPULSE immediately after Medtronic launched Affera. FE-7 added that UC San Diego Health also preferred Affera over FARAPULSE. FE-7 noted that Affera was more expensive than FARAPULSE and that Affera would have 100% market share if it was cheaper.

115. FE-7 explained that before using PFA to treat atrial fibrillation, physicians mainly used radiofrequency ablation (RFA). According to FE-7, Scripps and UC San Diego Health preferred Affera over FARAPULSE because it provided physicians with the ability to toggle between PFA and RFA during atrial fibrillation procedures. FE-7 noted that with FARAPULSE, physicians could only use PFA and did not have the ability to use RFA.

116. FE-7 detailed that Boston Scientific paid both Scripps and UC San Diego Health to be a Center of Training (COT) for FARAPULSE. According to FE-7, Boston Scientific had eight

FARAPULSE COTs in the United States. FE-7 explained that on FARAPULSE training days, physicians at both Scripps and UC San Diego Health could not use any other PFA systems other than FARAPULSE and were paid to exclusively use FARAPULSE. FE-7 added that once Affera launched, both Scripps and UC San Diego Health also became a COT for Affera.

117. FE-7 recalled that after Medtronic launched Affera, physicians at both Scripps and UC San Diego Health only used FARAPULSE as a backup. FE-7 explained that most hospitals maintained multiple EP labs but scaled down to two PFA systems. According to FE-7, physicians at Scripps and UC San Diego Health both preferred Affera but used FARAPULSE if their colleagues had already booked Affera first for their atrial fibrillation procedures. FE-7 detailed that physicians "would fight" to get time with Affera over FARAPULSE. FE-7 added that physicians at both Scripps and UC San Diego Health also used FARAPULSE on FARAPULSE training days that Boston Scientific paid for.

118. FE-7 stated that he was on the "frontend" of what was going on with FARAPULSE. FE-7 explained that because Scripps was the first customer to use Affera in the United States and because Southern California is an EP hotbed (along with New York and Arizona), he knew before his colleagues that FARAPULSE was rapidly losing market share. Therefore, FE-7 detailed that he "wanted out" and "saw the writing on the wall" in May 2025 because customers preferred Affera. FE-7 added that he warned his colleagues about FARAPULSE's market share in May 2025 and that a lot of colleagues subsequently departed the Company.

119. According to FE-5, physicians preferred Medtronic's Sphere-9 PFA catheter over Boston Scientific's FARAWAVE PFA catheter, largely because FARAWAVE is not a mapping catheter. FE-5 stated that only customers that prioritized saving money chose FARAWAVE over Sphere-9.

120. According to FE-1, Boston Scientific's concerns about Medtronic's Affera device began to grow as Affera took a significant number of Boston Scientific's accounts beginning around the summer of 2025 and that number continued to increase in the fall of 2025. FE-1 explained that, during that time, there were weeks when he would not have a case because the physicians were no longer using FARAPULSE but instead were using Affera. FE-1 reiterated that when newer and better technology had come out, referring to Affera, physicians were switching.

121. FE-1 also recalled that it was common for Boston Scientific to have a case get "flipped" before the procedure, meaning that it was initially supposed to involve FARAPULSE, but then "flipped" to using a competitor's product. According to FE-1, these flipped cases would then be marked as "lost to competitor" in Salesforce.

122. According to FE-1, Boston Scientific knew that the competition was going to cause a decline in the number of cases utilizing Boston Scientific's products. FE-1 stated that Boston Scientific had always expected cases to go down when a competitor launched a new product. FE-1 explained that EP is a cycle and when new technologies come out, physicians want to try it.

123. FE-2 detailed that New York City and New Jersey AF accounts were divided between four sales representatives: former AF Solutions Territory Manager, current AFib Solutions Regional Director, current AF Solutions Territory Manager and current Territory Manager. FE-2 noted that AF accounts in New York City and New Jersey included Mount Sinai Hospital, Montefiore, Morristown Medical Center and Englewood Hospital. FE-2 stated that Mount Sinai Hospital, Montefiore, Morristown Medical Center and Englewood Hospital were some of many accounts that Boston Scientific maintained in New York City and New Jersey. FE-2 noted that sales representatives assigned him and clinical representatives accounts to assist

during ablation procedures. FE-2 added that he was responsible for setting up EP labs for ablation procedures and supporting physicians during ablation procedures.

124. FE-2 recalled that Boston Scientific began to lose "a lot" of PFA cases to Medtronic and J&J between the end of 2024 and Spring 2025. FE-2 detailed that Boston Scientific lost a "significant" amount of PFA cases at Mount Sinai Hospital to Medtronic's Affera and a "significant" amount of PFA cases at Montefiore to J&J's VARIPULSE in 2025. FE-2 stated that Boston Scientific's PFA market share took "massive hits" from the end of 2024 through his departure in August 2025.

125. According to FE-2, these four sales representatives were "very transparent" with FE-2 and clinical representatives about the Company losing PFA market share to Medtronic and J&J in New York City and New Jersey. FE-2 explained that these four sales representatives told him and his clinical colleagues in regular meetings and through text messages that Boston Scientific was "losing so much" PFA business to Medtronic and J&J in New York City and New Jersey. FE-2 added that these four sales representatives gave presentations to clinical representatives detailing PFA cases that were lost in New York City and New Jersey in a given sales cycle to competition.

126. FE-2 detailed that the four sales representatives hosted dinners and invited clinical representatives, a clinical manager and a WATCHMAN manager. FE-2 explained that during these dinners, the four sales representatives provided updates on their accounts and told attendees that Boston Scientific was losing PFA cases in New York City and New Jersey.

127. FE-2 estimated that during Spring 2025, Boston Scientific was losing "a decent amount" of PFA cases per day in New York City and New Jersey. FE-2 stated that these four sales

representatives appeared stressed during this time period and told clinical representatives to talk about FARAPULSE's competitive advantages to customers to stay competitive in the PFA market.

### 3. The OPAL Mapping System Was Inferior to Competitors' Mapping Systems

128. FARAPULSE's competitive viability depended in part on the quality of the OPAL cardiac mapping system. As described below, former employees detail that physicians disfavored OPAL, viewing it as inferior to competitors' mapping technologies.

129. According to FE-9, Boston Scientific's cardiac mapping system RHYTHMIA was not profitable for 12 to 17 years. FE-9 recalled that the Company hired an outside consultant to improve the system and the consultant suggested that Boston Scientific just change its name. Therefore, FE-9 detailed that Boston Scientific rebranded RHYTHMIA as OPAL. However, FE-9 explained that customers did not like OPAL and that it is not widely used. FE-9 added that the Company gave away OPAL to certain customers for free.

130. FE-9 recalled that he attended a meeting with the marketing department in March 2025. FE-9 detailed that at this meeting, he raised concerns about the Company's mapping system, OPAL, and specifically pointed out that Medtronic has a better mapping system. However, FE-9 noted that marketing pushed back on his concerns. FE-9 added that the Company did not like when employees provided constructive feedback and instead wanted "everyone to drink the Kool-Aid."

131. FE-5 recalled that Boston Scientific's plan was to pair FARAPULSE with OPAL, its mapping system. However, FE-5 noted that Boston Scientific did not have enough quality mappers, which prevented the Company from obtaining this goal.

132. According to FE-1, most physicians did not use Boston Scientific's OPAL mapping system, and instead used the competitors' mapping systems, including Abbott and J&J. FE-1 recalled that the physicians did not like OPAL, and instead preferred J&J's CARTO mapping

system. FE-1 explained that the competitors' mappers were better trained and had more experience than the mappers at Boston Scientific. FE-1 further stated that Boston Scientific attempted to get more physicians to use OPAL by pairing it with FARAPULSE, but that Boston Scientific lacked trained mappers.

133. According to FE-1, once J&J launched their CARTO system with 4D ICE, it was even harder to appeal to physicians because the 4D ICE was considered an upgrade. In FE-1's opinion, Boston Scientific's technology was inferior because they did not have integration with the ICE catheter.

134. FE-7 stated that Boston Scientific's cardiac mapping system was "horrible" and that customers did not trust it. FE-7 detailed that the Company's initial mapping system was called RHYTHMIA and that customers did not like it. Therefore, FE-7 explained that Boston Scientific subsequently rebranded its mapping system as OPAL. However, FE-7 recalled that the feedback from customers after trying OPAL was that it was the "same shitty system." FE-7 noted the customers subsequently stopped using OPAL, except for pulmonary vein isolation (PVI) procedures.

135. FE-7 explained that cardiac maps should be high density and clear, but that OPAL was not and looked like a "blub on a screen." FE-7 added that OPAL was a complex system and that physicians preferred simpler mapping systems.

136. FE-7 stated that Boston Scientific was at a competitive disadvantage because 85% of EP labs in the United States already had either J&J's cardiac mapping system CARTO or Abbott's mapping system EnSite. FE-7 recalled that once Medtronic got into the EP business, "there was no room for Boston Scientific." FE-7 added that customers did not think of Boston Scientific as an EP company.

### G. Market Share Losses Were Tracked and Discussed Internally in Real Time

137. The competitive erosion described above was not hidden from the Company's leadership—it was actively tracked, discussed, and reported through every level of the Company's sales organization. Weekly sales meetings, Quarterly Sales Meetings attended by Defendants Fitzgerald and Spadea-Anello, and internal reporting systems all documented FARAPULSE's declining market share in real time, ensuring that the information reached the highest levels of the Company.

138. FE-8 recalled that sales numbers were constantly discussed at weekly sales meetings that he attended. FE-8 detailed that these weekly sales meetings were also attended by sales representatives, sales managers, and area vice presidents. FE-8 added that, during these weekly sales meetings, there were constant discussions about not losing FARAPULSE market share.

139. FE-8 recalled attending a meeting with Company executives at the end of 2024 when Affera first launched. FE-8 stated that Company executives admitted at this meeting that Medtronic sold twice as many Affera systems in 2024 as Boston Scientific projected it would. FE-8 stated that Company executives were turning a blind eye as to what was happening in the field.

140. FE-1 stated that field calls happened monthly or quarterly and that competition was discussed on these calls. FE-1 missed a lot of these calls due to being in procedures at the times of the calls. On the calls that he participated in, FE-1 recalled members of the C-suite attending, specifically Sam Conaway and Shawn Burke.

141. FE-1 explained that Shawn Burke would push employees to find more opportunities and encourage them to get as many cases as possible. FE-1 explained that there was a disconnect between what the company was talking about on the calls compared to what was actually happening in the field.

142. FE-5 detailed that he and all Company sales representatives participated in weekly or bi-weekly sales calls during his most recent tenure. According to FE-5, these weekly or bi-weekly sales calls were led by current EP VP of Sales, West Sector VP of Sales Shawn Burke and current Global Vice President and General Manager WATCHMAN Matt Risinger. FE-5 recalled that Burke and Risinger began telling attendees in the Summer or Fall of 2025 that Boston Scientific was losing Pulsed Field Ablation (PFA) market share due to increasing competition and that the Company's PFA market was stalling and not growing.

143. FE-5 explained that he often spoke with colleagues located throughout the United States (U.S.) during his tenure as an AFib Solutions Territory Manager. Based on these conversations with colleagues, FE-5 recalled that Boston Scientific gradually began to lose PFA market share in early 2025. FE-5 noted that Boston Scientific's U.S. territories began to lose PFA market share at different times throughout 2025.

144. For example, FE-5 stated that Boston Scientific began to lose PFA market share in a western state in July 2025. FE-5 detailed that prior to July 2025, FARAPULSE maintained 95% of PFA market share in a western state. However, FE-5 estimated that FARAPULSE lost 25 to 30% of PFA market share in a western state by the end of 2025. FE-5 added that the following regions lost the largest amount of PFA market share in 2025: Pennsylvania; Virginia; New York; Massachusetts; Ohio; Southern California; Colorado; and Texas.

145. According to FE-5, it was known internally that Boston Scientific was facing PFA competition from Medtronic and J&J. FE-5 detailed that the Company was aware Medtronic's Affera was growing faster than J&J's VARIPULSE. FE-5 stated that it was known internally in Spring 2025 that Medtronic had placed an increasing amount of Affera PFA systems in hospitals in the U.S. FE-5 detailed that it was discussed during team calls in Spring 2025 that Affera systems

were showing up at hospitals throughout the U.S. FE-5 noted that Boston Scientific was still placing FARAPULSE systems at hospitals in the U.S. in early 2025. However, FE-5 explained that Affera was on an upward trajectory in 2025 and Medtronic placed additional Affera systems in U.S. hospitals as the year went on.

146. FE-5 recalled that EP sales dramatically declined in Q4 2025 due to changes in the market. FE-5 detailed that beginning in late Q3 2025, EP VP of Sales, West Sector VP of Sales Shawn Burke and current Global Vice President and General Manager WATCHMAN Matt Risinger told attendees during weekly or bi-weekly sales calls that "everyone needs to go out and do more" due to declining EP sales. FE-5 noted that he was 40% short of obtaining his EP sales quota in Q4 2025. FE-5 added that Q4 EP sales quotas were too aggressive and would still have been missed even if Affera did not take PFA market share from the Company.

147. FE-9 stated that he attended internal EP strategy meetings. FE-9 noted that these EP strategy meetings were also attended by senior leaders, including current EVP and Group President, Cardiovascular, Joseph Fitzgerald and current Executive Vice President and President, AF Solutions Nick Spadea-Anello, as well as the EP finance team.

148. According to FE-9, it was stated in internal strategy meetings in 2024 that Boston Scientific expected to lose 20 PFA market share points across the U.S. to Medtronic in the first 12 months after Affera was launched. FE-9 noted that current CEO Mike Mahoney was aware of this projection.

149. FE-9 detailed he communicated with vice presidents and higher-ranking employees in EP in 2025. Based on these conversations with EP leaders, FE-9 estimated that Boston Scientific lost approximately 20% of its PFA market share across the U.S. to Affera by the time of his departure in spring 2025.

150. FE-6 recalled that he attended regular regional sales calls during his tenure. FE-6 noted that Boston Scientific also held impromptu national sales calls to inform salespeople of important new developments in the market which were held via Zoom. FE-6 detailed that he attended between three and five impromptu national sales calls during his tenure. FE-6 added that these impromptu national sales calls were organized and led by current EP VP of Sales, West Sector VP of Sales Shawn Burke and current Global Vice President and General Manager WATCHMAN Matt Risinger. FE-6 noted that he found these impromptu national sales calls to be alarming.

151. According to FE-6, Burke and Risinger began telling salespeople during impromptu national sales calls in early summer 2025 that Boston Scientific was losing "significant" PFA market share nationwide to Medtronic. FE-6 detailed that Burke and Risinger continued telling salespeople during impromptu national sales calls throughout 2025 that Boston Scientific was losing "significant" PFA market share nationwide to Medtronic and J&J. FE-6 noted that after J&J's VARIPULSE initially experienced clinical issues it "came back like gangbusters" and took additional PFA market share from FARAPULSE in 2025.

152. FE-6 added that Burke and Risinger told salespeople during impromptu national sales calls in 2025 that Boston Scientific was losing PFA market share because of new competition and implored them to stay in front of customers to prevent the loss of additional PFA market share.

153. FE-6 noted that current President, U.S. Cardiology Sales Sam Conaway attended one impromptu national sales call during his tenure, which was held in Q1 2026. FE-6 detailed that Conaway told salespeople during this impromptu national sales call that WATCHMAN's numbers were "severely down."

154. FE-3 also recalled regional sales meetings taking place in person once per quarter led by regional managers. FE-3 added that local regional managers and vice presidents were in attendance, as well as Tim Schmitt on some occasions, who was the Vice President. According to FE-3, the competition was often discussed during the regional sales meetings. FE-3 recalled market share being discussed on some of the regional sales calls.

155. According to FE-3, it was clear that sales growth was slowing based on conversations he had with sales representatives about their "territory being smoked," meaning that Boston Scientific was losing sales to competitors across the country. FE-3 further said that Boston Scientific sales representatives were "crushing it for years" until Affera launched.

### H. Defendants Were Personally Informed of FARAPULSE's Competitive Collapse and Dismissed Warnings

156. Concerns about FARAPULSE's declining competitiveness and accelerating market share losses were directly communicated to senior executives, including Defendants, who dismissed or failed to meaningfully act on those warnings.

#### 1. Former Employees Repeatedly Warned Defendants, Including Spadea-Anello and Fitzgerald, that FARAPULSE Was Losing to Affera

157. According to FE-8, EP sales leaders downplayed PFA competition. FE-8 defined sales leaders as vice presidents and the levels above vice presidents. FE-8 recalled that when Boston Scientific's clinical team asked sales leaders where their PFA growth projections were coming from, sales leaders did not have the data to back up their growth projections.

158. FE-8 recalled that he and his colleagues told area vice presidents that FARAPULSE was losing market share to Affera. FE-8 said that he was told that this information was being reported to current CEO Mike Mahoney.

159. FE-8 stated that he met with current Executive Vice President and President, AF Solutions Nick Spadea-Anello from 2023 to mid-to-late 2024. FE-8 detailed that he initially met

with Spadea-Anello monthly and then quarterly. FE-8 explained that he told Spadea-Anello that FARAPULSE was losing market share to Affera during their meetings. According to FE-8, Boston Scientific did not have a game plan to compete against Affera.

160. FE-8 detailed that he also met with current Executive Vice President and President, AF Solutions Nick Spadea-Anello monthly and quarterly in 2024 and 2025. FE-8 recalled that he expressed concerns about PFA competition during his meetings with Spadea-Anello, but he dismissed these concerns.

161. FE-8 recalled that when he initially began meeting with Spadea-Anello, he shared general information about the EP space, including its structure. FE-8 detailed that he expressed his concern to Spadea-Anello about merging EP and WATCHMAN because they are very different divisions and that he suggested merging WATCHMAN and CRM because they are more similar.

162. FE-8 stated that he regularly spoke with current EP VP of Sales, West Sector VP of Sales, Shawn Burke during his tenure. FE-8 detailed that in early to mid-2024, he told Burke that customers preferred Affera over FARAPULSE and asked him if he had also heard this. FE-8 noted that Burke confirmed that he also knew customers preferred Affera over FARAPULSE. FE-8 then asked Burke what the Company was going to do about this, and he did not have an answer.

163. FE-8 noted that he also told other Company leaders that customers preferred Affera over FARAPULSE, including current Area Vice President Tim Schmitt. FE-8 detailed that on the day he resigned from Boston Scientific he asked Schmitt about Affera and that Schmitt told him that he had heard that Affera was taking market share from FARAPULSE.

164. FE-7 recalled that he attended Quarterly Sales Meetings with sales leaders, including current EP VP of Sales, West Sector VP of Sales Shawn Burke, current President, US Cardiology Sales Sam Conaway, current EVP and Group President, Cardiovascular, Joseph

Fitzgerald and current Executive Vice President and President, AF Solutions Nick Spadea-Anello. According to FE-7, Burke, Conaway, Fitzgerald and Spadea-Anello all reported to current CEO Mike Mahoney. FE-7 detailed that during these Quarterly Sales Meetings, he and his colleagues told sales leaders that no one wanted OPAL and that customers preferred Affera over FARAPULSE, among other things. However, FE-7 explained that sales leaders did not want feedback and redirected the conversation. FE-7 added that he emailed Conaway to tell him about the issues with OPAL and FARAPULSE right before his departure in August 2025.

165. According to FE-3, there were national sales meetings that happened in person once a year. FE-3 recalled members of the C-Suite in attendance at the meetings, including Mike Mahoney, current Chairman and CEO of Boston Scientific, Nick Spadea-Anello, current Executive Vice President and President, AF Solutions, and Sam Conaway, current President, U.S. Cardiology Sales. FE-3 explained that during the national sales meetings, there were breakout sessions where each competitor was discussed. FE-3 also recalled presentations about competition.

### 2. Customers Told Defendants Directly at Industry and National Meetings That They Preferred Affera Over FARAPULSE

166. FE-9 stated that Boston Scientific attended the 2024 Heart Rhythm Society (HRS) annual meeting. FE-9 detailed that he was in charge of creating current CEO Mike Mahoney and current Executive Vice President Art Butcher's agenda at the 2024 HRS meeting. FE-9 explained that current Executive Vice President and President, AF Solutions Nick Spadea-Anello gave FE-9 direction as to Mahoney and Butcher's agenda at the 2024 HRS meeting.

167. According to FE-9, Spadea-Anello wanted Mahoney and Butcher to attend sessions at HRS in 2024 to learn more about and get exposure to Affera and Sphere-9 because Affera posed the biggest threat to FARAPULSE. FE-9 noted that Boston Scientific wanted to learn as much about Affera early on so that it could defend against its launch. Therefore, FE-9 recalled that

Mahoney and Butcher both sat in sessions to learn more about Affera and attended an Affera late breaking clinical trial at the 2024 HRS meeting.

168. FE-9 stated that he was also in charge of creating current CEO Mike Mahoney and current Executive Vice President Art Butcher's agenda at the 2025 HRS meeting. FE-9 noted that Boston Scientific eliminated his position the day before the 2025 HRS meeting began. However, FE-9 noted that the emphasis for Mahoney and Butcher's agenda at the 2025 HRS meeting was Medtronic because it was the Company's largest threat. FE-9 detailed that Medtronic is developing a new catheter called Sphere-360 and that one of Mahoney and Butcher's agendas at the 2025 HRS meeting was to learn more about it.

169. FE-7 stated that Boston Scientific attended an annual meeting hosted by the Heart Rhythm Society (HRS). FE-7 referred to this annual HRS meeting as the "Super Bowl for EPs" and explained that attendees talked about what was going on in the EP market at the HRS meeting. FE-7 recalled that Boston Scientific featured FARAPULSE at the 2025 HRS meeting more than any other EP product.

170. FE-7 detailed that at the 2025 HRS meeting held in April 2025, Boston Scientific hosted customers from the United States. FE-7 stated that sales representatives scheduled appointments and "black box" conversations between customers and Company leadership, including current CEO Mike Mahoney, current EVP and Group President, Cardiovascular, Joseph Fitzgerald and current EP VP of Sales, West Sector VP of Sales Shawn Burke.

171. According to FE-7, customers expressed their concerns to Mahoney, Fitzgerald and Burke at the 2025 HRS meeting. FE-7 specified that customers told Mahoney, Fitzgerald and Burke at the 2025 HRS meeting in April 2025 that they did not want Boston Scientific's mapping system or catheter portfolio and that they preferred Affera over FARAPULSE. FE-7 added that

Boston Scientific began to push customers to integrate its mapping system, OPAL, with FARAPULSE at the 2025 HRS meeting, even though customers stopped using OPAL.

172. FE-4 recalled attending Boston Scientific's National Sales meeting and a Cardiology group meeting shortly before his September 2025 departure. FE-4 detailed that AFib regional sales directors at the National Sales and Cardiology group meetings in 2025 informally discussed how FARAPULSE was losing market share to Medtronic's PFA system Affera. According to FE-4, these AFib regional sales directors stated at the National Sales and Cardiology group meetings in 2025 that Affera was "eating our lunch" at certain hospitals and that they expected to lose additional PFA market share to Biosense Webster's PFA system VARIPULSE. FE-4 noted that current President of U.S. Cardiology Sales Sam Conaway and current EVP and Group President, Cardiovascular Joseph Fitzgerald attended both the National Sales and Cardiology group meetings in 2025. FE-4 added that current CEO Mike Mahoney was "very much in the know" regarding Boston Scientific losing PFA market share to Affera based on the Company's reporting structure.

## VII. DEFENDANT MAHONEY ENGAGED IN INSIDER TRADING IN VIOLATION OF SECTIONS 10(b) AND 20A OF THE EXCHANGE ACT BY SELLING MORE THAN $15 MILLION WORTH OF BOSTON SCIENTIFIC COMMON STOCK WHILE IN POSSESSION OF MNPI

173. Boston Scientific's Stock Trading Policy applies to all directors, officers, and employees of the Company, including Defendant Mahoney, and states the following, in relevant part:

> No Covered Person[4] may (i) trade in or gift BSC's securities during any period of time in which such person has knowledge of material information about BSC that has not been made available to the investing public (other than trades made pursuant to a pre-approved trading plan that complies with SEC Rule 10b5-1 or certain

[4] Boston Scientific's Stock Trading Policy defines "Covered Person" as including a "BSC director, employee, or third-party vendor, contractor, consultant or other staff or service provider of BSC."

> specified activity under Company employee plans, including the Company's employee stock purchase plan (ESPP), or gifts in certain circumstances, each as discussed below) or (ii) "tip" or disclose MNPI[5] concerning BSC or make any recommendations or express opinions on the basis of MNPI as to trading in BSC securities (or any other company or its securities to the extent such information is acquired in the course of employment with, or the performance of services on behalf of, BSC) to any other persons or entities (including Related Insiders or any other Covered Persons, analysts, individual investors and members of the investment community and news media), unless such disclosure is made in accordance with BSC's policies regarding the protection or authorized external disclosure of information and only to the extent permitted by securities laws.

174. Boston Scientific's Stock Trading Policy provides designated trading windows during which Company insiders may execute trades in Boston Scientific securities:

> There will ordinarily be a window for trading open in each fiscal quarter during the period beginning on the second business day after the date upon which BSC's earnings for BSC's immediately preceding fiscal quarter have been publicly announced and ending at market close on the last business day of the second calendar month of the quarter in which the announcement is made. There is also an additional trading limitation with respect to the release of annual financial results. Individuals holding any of the above-listed positions [which includes, among others, any director or executive officer] (and any Related Insiders of such individual) may only transact in BSC's securities during the period beginning on the second business day after the date upon which BSC's earnings for the immediately preceding fiscal year have been announced and ending on the later of (i) market close ten business days thereafter or (ii) market close on the last business day of the second calendar month of the quarter in which the announcement is made.

175. Additionally, Boston Scientific's Stock Trading Policy states the following, in relevant part:

> Compliance with the trading periods . . . does not excuse an individual (or any Related Insiders of such individual) from compliance with the prohibitions in this Policy, including against trading on MNPI, trading during limited trading periods ('blackout periods'), selling short, failing to provide notice to BSC prior to a trade, or trading in the stock of applicable third parties while in possession of MNPI.

---

[5] Boston Scientific's Stock Trading Policy defines "MNPI" as "confidential details about a company or its securities that have not been disclosed to the general public but could significantly impact an investor's decision to buy, sell, or hold those securities."

176. Further, the policy makes clear that "[a]ll employees, including those in information sensitive positions, are required to evaluate whether they are in possession of MNPI prior to executing transactions involving BSC securities, even during open window periods."

177. Boston Scientific's Stock Trading Policy placed Defendant Mahoney on notice that trading while in possession of MNPI was prohibited, and that for the Company's directors and executive officers, trading was restricted around the release of financial results. Yet, Mahoney violated Boston Scientific's Stock Trading Policy by selling 160,901 Boston Scientific shares for approximately $15 million on February 2, 2026—just two days before Boston Scientific reported its fourth quarter and full-year 2025 results, and therefore outside of the trading window. Mahoney's timing was suspicious: the trade was executed two days before investors learned that U.S. EP sales had flattened, that FARAPULSE had lost PFA market share, and that further share losses were expected in 2026. Additionally, by February 2, 2026, Mahoney already knew Boston Scientific's year-end results and the adverse EP, and in particular FARAPULSE, trends that would be disclosed to the market two days later.

178. Defendant Mahoney cannot avoid liability by invoking his Rule 10b5-1 trading plan: Boston Scientific's Stock Trading Policy permits reliance on such a plan if it is entered into when the insider is not aware of MNPI and requires that the plan be adopted in good faith. But Mahoney adopted his plan on August 29, 2025—during the Class Period and while possessing MNPI. The timing of the plan's adoption undermines an inference that his trading was pre-scheduled in good faith, and instead supports an inference that Mahoney was motivated to liquidate a substantial portion of his holdings while the Company's stock remained artificially inflated, as discussed *infra*.

179. Thus, Defendant Mahoney's February 2, 2026 trading violated Sections 10(b) and 20A of the Exchange Act because he had a duty to publicly disclose the MNPI he possessed before executing his trade or to abstain from trading altogether, but Mahoney did neither.

## VIII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

180. Plaintiffs allege that the statements identified in ***bold and italics*** within this section were materially false and misleading because, among other reasons, they failed to disclose material information of which Defendants were aware or were reckless in not knowing. As alleged herein, such statements, along with Defendants' fraudulent scheme, artificially inflated and/or artificially maintained the price of Boston Scientific common stock and operated as a fraud or deceit on all persons and entities that purchased or otherwise acquired Boston Scientific common stock during the Class Period. Because Defendants chose to speak on the issues described below, and thereby put these subjects into play, Defendants had a duty to fully, completely, and truthfully disclose all material facts and information regarding these issues. As described below, Defendants created an impression of a state of affairs at Boston Scientific that differed in a material way from the one that actually existed.

181. Each statement and all conduct in this section by or attributed to Defendants Mahoney, Monson, Stein, Fitzgerald, and Spadea-Anello are attributable to Defendant Boston Scientific as well because each such statement or conduct was made or performed by the relevant Individual Defendant in his capacity as a representative of Boston Scientific, and because each such statement or conduct can be properly deemed a statement or conduct of or by Boston Scientific.

### A. <u>May 28, 2025</u>: Bernstein Strategic Decisions Conference

182. On May 28, 2025, Defendants Mahoney and Stein participated in the Bernstein Strategic Decisions Conference. During the conference, Defendant Mahoney stated the following regarding the Company's growth prospects and position in the market:

> ***So our underlying market growth at Boston is very strong. And we happen to have a very unique position in what I think I will call the 3 largest, highest growth markets in all of medtech, in the EP category, in the LAAC category, and I would add a new, Ken[neth M. Stein], concomitant with the combination of PFA and LAAC is extremely strong***.

183. Defendant Stein was asked by an analyst how "FARAPULSE perform[s] as comps get tougher" and "[w]hat are you seeing out there with the launch[,]" to which Stein responded:

> So -- and I say this and our IR team hates me for saying it, right, but ***it's a market that's effectively infinite in size, right? So there's a huge runway for a lot of growth. And FARAPULSE came into that, right, and is such a win-win for everyone.*** It's better for patients, better for docs.
>
> * * * *
>
> ***And I think there is a very long and very wide runway as long as we continue to develop at that capacity that's necessary to deal with all of these patients.***

184. In response to an analyst's question about whether the Company "see[s] any rate limiting factors in the medium term and long term for growth" for FARAPULSE, Defendant Stein stated that the "***the only rate-limiting factor to growth at this point is going to be lab capacity***."

185. Defendant Mahoney was then asked to "talk[] about the competitive landscape," to which Mahoney dismissed the concerns about competition affecting FARAPULSE's performance:

> ***I would say our competitive position is stronger now than we thought it would be 15 months ago, given some of the challenges of some competitors and the fact I mentioned earlier***. . . .
>
> . . . ***So we think we have such an unusual headstart***. And you can't do this across every division, but we put, as you might expect, more attention and focus on dollars and investment in this category, along with WATCHMAN and concomitant than we do anywhere else.

> . . . ***We have the lion's share of the lead. The market is underpenetrated. So there will be more competition, but we've got a terrific headstart and a great portfolio.***

186. Also, during the conference, Defendant Mahoney was asked about the "consistently strong" growth of WATCHMAN, to "reflect a little bit on the rapid uptake in the field" and what the Company was "seeing out there" with concomitant procedures. Mahoney responded, in pertinent part:

> So there -- we continue to have an opportunity to train many more EPs to do the concomitant procedure, which we're doing. . . .
>
> ***But it's very early innings. But that's what I mentioned before. If you look at the -- I hate the word competitive moat, but I guess I'll use it. I think the 3 best markets in medtech is EP, LAAC and the emergence of concomitant. And if you look at the growth profile for many years to come, there's no better markets to be in***.
>
> And fortunate we're to have earned a leadership position in both, LAAC and FARAPULSE. ***And then when you have the combined procedure that requires both products, we are uniquely positioned off for that. Many of our competitors don't offer one or the other***.

187. Defendants' statements in ¶¶182-86 were materially false and misleading when made in that they failed to disclose the following adverse facts, which were known to or recklessly disregarded by Defendants:

a. FARAPULSE was ill-equipped to launch and was not provided with the right contracts or experienced sales leaders;

b. Boston Scientific had a "horrible business strategy" and "unrealistic expectations" to grow their market share for FARAPULSE, including that the Company lacked expert mappers and lacked appropriately trained staff to support FARAPULSE;

c. Training on FARAPULSE was rushed and insufficient because the Company's priority was getting as many people in procedure rooms as quickly as possible

so that physicians could use FARAPULSE (a Boston Scientific representative had to be present for a physician to use the device);

d. Even before Affera was approved by the FDA in October 2024, Medtronic conducted presales and engaged with key FARAPULSE customers;

e. In mid-2024, hospitals were telling Boston Scientific that they would only be using FARAPULSE to hold them over until Affera became available;

f. Boston Scientific's sales were impacted "immediately" when Affera launched and the Company's PFA share took "massive hits" from the end of 2024 through 2025;

g. Customers preferred Affera over FARAPULSE and disliked OPAL and the Company's catheter portfolio, and told Defendants so at the April 2025 HRS meeting;

h. In spring 2025, Medtronic placed an increasing amount of Affera PFA systems in hospitals in the U.S. and was on an upward trajectory in 2025;

i. Boston Scientific internally projected that it would lose 20 U.S. PFA market-share points to Medtronic within the first 12 months of Affera's launch—a loss that had already materialized by spring 2025 according to one FE's estimation;

j. FARAPULSE and its components often did not work, resulting in physicians submitting complaints and returning the device;

k. Boston Scientific was giving away free products, including mapping systems and FARAPULSE. Some hospitals still rejected FARAPULSE despite it being given away for free; and

l. The OPAL mapping system was "horrible," customers did not trust it and preferred competitors' mapping systems.

188. Securities analysts reacted favorably to Defendants' statements at the Bernstein Strategic Decisions Conference. On May 30, 2025, analysts at Piper Sandler published a report titled, *The Post-Farapulse Playbook – Plenty of Growth Drivers Lined Up Next*, in which Piper Sandler analysts stated that "we still see a long runway for growth for the Farapulse franchise," and concluded that "we believe Boston will be able to sustain its double-digit top-line growth for many years to come," and wrote that "Boston could well be on its way to the #1 position within electrophysiology."

189. On June 3, 2025, analysts at Bernstein published a report titled, *Boston Scientific: Still plenty of upside; CEO meeting takeaways*, in which the Bernstein analysts noted that "[m]anagement exuded confidence on Farapulse" and directly echoed Defendants' claims about FARAPULSE's competitive position: "There is nothing to challenge BSX's dominance in the singleshot PFA segment in the near-term, which gives BSX an extended tailwind to keep taking share," and parroting Defendant Stein's assertion that "[t]he only rate limiting factor at this point seems to be EP lab capacity."

**B. <u>July 23, 2025</u>: Q2 2025 Financial Results**

190. On July 23, 2025, before the market opened, Boston Scientific announced its second quarter financial results in a press release filed on Form 8-K with the SEC ("Q2 2025 Press Release"). The Q2 2025 Press Release reported that, in the second quarter, organic net sales grew 17.4%, exceeding the high end of the previous guidance range of 13% to 15%, and highlighted that Boston Scientific was raising guidance for FY2025 from 12% to 14%, to 14% to 15%.

191. On July 23, 2025, Defendants Mahoney, Monson, and Stein, among others, participated in Boston Scientific's earnings call to discuss the Company's second quarter 2025

financial results ("Q2 2025 Earnings Call"). During the Q2 2025 Earnings Call, Defendant Mahoney emphasized Boston Scientific's expectation for continued durable growth in its EP business unit:

> Electrophysiology sales grew 94%, lapping our first full quarter of the FARAPULSE launch in the U.S. and growing mid-teens sequentially, ***supported by accelerated placements of the OPAL mapping system, our portfolio of access solutions and uptake of concomitant procedures.***

192. During the Q2 2025 Earnings Call, Defendant Stein represented that the Company's EP business unit would see "***continued market growth in the United States***" in response to the following question from Wells Fargo analyst Lawrence H. Biegelsen:

> Lawrence H. Biegelsen [Wells Fargo]: . . . So for [Mahoney] or Dr. Stein, maybe you talked about the growth vectors for your EP business market growth, PFA adoption, new geographies, new products, et cetera. How would you have us think about these pieces and what your EP business could look like in 3 to 5 years? And any color on the proposed ASC codes and what they could mean for you?
>
> Kenneth M. Stein: . . . it's a little bit all of the above. And we will get a lot deeper into that, as you say, that long-range plan look at our Investors Day. I think sort of -- again, ***the quick answer beyond it's all of the above is its continued market growth in the United States as you look at the safety profile with FARAWAVE, as with the predictability of the case is as you look at the efficacy, accumulating data now actually for superior outcomes compared to thermal ablation***.
>
> . . . We do think that we are uniquely positioned to take advantage of procedures in the ASC. ***And again, it gets to the safety, it gets to the predictability, but it also gets to some of the economic advantages using FARAWAVE with FARAVIEW compared to the competition.***

193. Additionally, during the Q2 2025 Earnings Call, when asked by an analyst about competition, Defendant Mahoney touted the EP business unit's growth potential and stated that growth that will "***still be likely mid-teens growth***," even when it starts to slow:

> Matthew Oliver O'Brien [Piper Sandler]: . . . I know a big concern that investors have is just competition coming in, you've got some established competitors with big mapping footprint out there.

> So just your ability to kind of defend yourself or just said another way, the most you're building here between OPAL, all the catheters plus concomitant cases. How wide is that moat in your opinion and how much wider can it get?
>
> Michael F. Mahoney: . . . .
>
> ***So we do feel like we have some unique advantages that are highly differentiated with FARAPULSE and [Stein] detailed out, and you'll see at the Investor Day quite a bit, how we're widening the portfolio for -- and then plus the underlying market growth is nearly 20% right now. And clearly, that will slow down over time. But it will still be likely mid-teens growth and the largest, fastest-growing market in med tech. . . .***

194. Defendants' statements in ¶¶191-93 were materially false and misleading when made for the reasons set forth in ¶187. In addition, Defendants failed to disclose the following adverse facts, which were known to or recklessly disregarded by them:

a. In early summer 2025, Burke and Risinger told Company salespeople that Boston Scientific was losing "significant" PFA market share nationwide to Medtronic;

b. In summer 2025, FARAPULSE sales were declining and Affera had taken a significant number of Boston Scientific's accounts; and

c. There were weeks when Boston Scientific representatives had no AFib procedures to attend because physicians were using Affera rather than FARAPULSE.

195. Securities analysts reacted favorably to Defendants' statements on the Q2 2025 Earnings Call. On July 23, 2025, analysts at Goldman Sachs published a report titled, *Boston Scientific Corp. (BSX): 2Q25 First Take: Organic Revenue Growth Beat-and-Raise; Margins Need Some Further Explanation*, in which they noted that "Boston Sci's results and select physician conversations this morning point to Farapulse clearly maintaining a leadership position in PFA with other platforms continuing to face workflow and supply challenges." Also on July 23,

2025, analysts at J.P. Morgan published a report titled, *Key Takeaways from Our 2Q25 Call with Management*, in which they "reiterate[d] Boston as a top pick and multi-year compounder we'd want to own," writing that "[m]anagement continues to expect rapid conversion to PFA driven by Farapulse alongside Farapoint approval in 2H."

**C. August 1, 2025: Q2 2025 Form 10-Q**

196. On August 1, 2025, before the market opened, Boston Scientific filed its quarterly report for Q2 2025 on Form 10-Q with the SEC (the "Q2 2025 10-Q"), accompanied by SOX Certifications signed by Defendants Mahoney and Monson. The Q2 2025 10-Q incorporated by reference the risk disclosures in Boston Scientific's annual report filed on Form 10-K with the SEC on February 18, 2025 ("2024 10-K"), which in turn stated, in pertinent part:

> ***We face intense competition and may not be able to keep pace with the rapid technological changes in the medical devices industry, which could have an adverse effect on our business, financial condition or results of operations***.
>
> * * * *
>
> [T]he medical device markets in which we participate are characterized by extensive research and development and rapid technological change. ***Developments by other companies of products and/or services, processes or technologies may make our products or proposed products obsolete or less competitive and may negatively impact our net sales***. . . . ***If we fail to develop or acquire new products or enhance existing products, such failure could have a material adverse effect on our business, financial condition or results of operations***. In addition, a delay in the timing of the launch of next-generation products and the overall performance of, and ***continued physician confidence in, those products may result in declines in our market share and have an adverse impact on our business, financial condition or results of operations***.
>
> ***We may experience declines in market size, average selling prices for our products, medical procedure volumes and our share of the markets in which we compete, which may materially adversely affect our results of operations and financial condition***.
>
> We continue to experience pressures across many of our businesses due to competitive activity, increased market power of our customers as the health care industry consolidates, national and regional government tenders, economic pressures experienced by our customers, staffing shortages within health care

> facilities that have and may continue to negatively impact demand for our products, public perception of our products, and the impact of managed care organizations and other third-party payers. ***These and other factors may adversely impact market sizes, as well as our share of the markets in which we compete, the average selling prices for our products or medical procedure volumes. There can be no assurance that the size of the markets in which we compete will increase, that we will be able to hold or gain market share or compete effectively on the basis of price or that the number of procedures in which our products are used will increase. Decreases in market sizes or our market share and declines in average selling prices or procedural volumes could materially adversely affect our results of operations or financial condition***.

197. Defendants' statements at ¶196 *hypothetically* warned that new products developed by other companies *may* make Boston Scientific's product "less competitive," *may* "impact [the Company's] net sales, and *may* "result in declines in [the Company's] market share and have an adverse impact" on the business. These statements were materially misleading for the reasons stated in ¶¶187, 194. In particular, Defendants failed to disclose that, even before the Class Period: (i) competitors such as Medtronic were gaining significant traction in the U.S. PFA market; (ii) hospitals told Boston Scientific employees that they were using FARAPULSE only as a holdover device and abandoning it once competing systems received FDA approval; and (iii) customers had directly told Defendants they preferred Affera over FARAPULSE.

### D. September 30, 2025: Boston Scientific 2025 Investor Day Conference

198. On September 30, 2025, Defendants hosted Boston Scientific's 2025 Investor Day Conference. During the Company's Investor Day presentations, Defendant Fitzgerald highlighted a continued growth trajectory for the Company's EP business unit, stating:

> . . . I'm going to start with our highest growth markets, EP and WATCHMAN. So EP, as you know, $13 billion market, largest in medtech and the fastest growing in medtech. So we see over the long-range plan, the EP market growing at 15% and Nick [Spadea-Anello] and Dr. Sutton will talk about how ***we're going to outpace the market. The basic headline there is we will continue to take share in the broad EP market,*** and we will enter portions of the EP market that we're not in today, such as ICE, which is a $1 billion market opportunity that we intend to use our SoundCath acquisition to get into.

199. Similarly, Defendant Spadea-Anello stated: "***FARAPULSE is the #1 PFA prescribed product across the world for electrophysiologists and we are going to deliver clear meaningful growth with this technology as we expand our overall portfolio***."

200. During the 2025 Investor Day Conference, Defendant Spadea-Anello further stated the following regarding FARAPULSE's growth trajectory:

> New estimates point to approximately 60 million AF patients exist throughout the world. And we're making key investments in our engineering, manufacturing, clinical evidence and our commercial capabilities ***to really able to outpace the market***, as [Defendant Fitzgerald] had mentioned earlier in his comments ***and really continue to take more share across the world as we launch*** and go deeper and deeper into other markets.

201. During the 2025 Investor Day Conference, Defendant Spadea-Anello also stated: "***We've got an EP market that is meaningfully large and rapidly expanding, and we see strong adoption of PFA.*** We see that action going from 50% today globally to 80% in 2028 with FARAPULSE. We're uniquely positioned to lead and backed by our deep experience and the continued evolution of our PFA catheter portfolio that you saw here today."

202. During the question-and-answer portion of the Company's 2025 Investor Day Conference, Wells Fargo analyst Lawrence H. Biegelsen stated that "one of the biggest concerns investors have is [the Company's] share within the PFA ablation catheter segment as competition increases" and asked "[w]here do you think your share of PFA is today? What are you assuming for your PFA share over the LRP? And your slide said you aim to be EP market leader. Do you expect to get there by 2028?" Defendants responded:

> Nicholas Spadea-Anello: . . . So first of all, we don't share details -- specific details on market share. But I hope that seeing the number of patients we've been able to serve and the portfolio that we have, today's workhorse catheter is the fairway of catheter. And the simplicity of it, the versatility of it to do multiple lesions, whether it's PVI, posterior wall and persistent or paroxysmal patients. We think as we evolve that even further with all the mapping capabilities integrated and the portfolio to offer other tools, we can do a lot of things there that continues this growth journey into the foreseeable future. We feel very confident about that.

> And you're going to see other strategics. ***The good thing is that we were first with PFA. And while other strategics had other energy modalities that they did very well in, they came a little bit later. . . .***
>
> Michael F. Mahoney: . . . ***But our confidence in it, and I think Nick [Spadea-Anello] did a great job on his slide, its FARAWAVE, the FARAPOINT, the OPAL, it's the ecosystem that Nick [Spadea-Anello] talked about, which is super important to understand that.***

203. Later in the question-and-answer portion, Mizuho Securities analyst Anthony Charles Petrone asked about the "competitive landscape in EP," to which Defendant Spadea-Anello responded, in part: "***So we've got a suite of offerings that makes us really competitive, not just in the workhorse area of the market, but also the complex areas.***"

204. In response to an analyst's question about the use of OPAL, Defendant Spadea-Anello stated that "[w]e're not going to share specific details on how much utilization we're seeing with OPAL," and that "***the uptick in OPAL adoption the last 6 to 12 months has been exceedingly high for us***." Defendant Fitzgerald added that, "***as you look at the utility of the FARAWAVE, then FARAPOINT workflow, we have the highest utility across the ecosystem of how EPs like to do procedures. So that's not a bad thing for us***."

205. A securities analyst also inquired about the "share dynamic in EP" and competition, to which Defendant Spadea-Anello responded that Boston Scientific was "***insulating***" itself from competition "***by having an entire ecosystem tied to our mapping system***":

> Matthew Oliver O'Brien [Piper Sandler]: I kind of want to circle back to . . . the share dynamic in EP because by my numbers, you're about 75%, 80% share of PFA at this point. I can think back to -- although there's two of you in the space now essentially at this point, right, you guys and Medtronic. I can think back to other categories like DES and CRM, where you've seen a lot of variability in share over time. What makes it different for you guys with PFA and your portfolio this time where you can insulate yourself and keep that share versus what we've seen with some pretty big share movements in other areas of cardio historically?
>
> Nicholas Spadea-Anello: It's a great question. And again, we're not going to be respectfully specific on share. But what's different about this is the ecosystem, and you saw that slide. ***The ecosystem starts to take, call it, PFA today that is going to***

> ***have mapping capabilities and some of the things that I talked about that will be exclusive and unique to us.***
>
> * * * *
>
> ***So we're insulating ourselves by having an entire ecosystem tied to our mapping system. And we know that the hard way because we lost when it came to RF and tying it together. We learned the hard way when it comes to now having a new energy modality where we're leading and leading big to capitalize on that and capitalize on that in a big way.***

206. The Company's 2025 Investor Day featured a slideshow presentation, which was published on the Company's website ("2025 Investor Day Presentation"). The 2025 Investor Day Presentation included a slide titled "Electrophysiology ~$13B served market growing ~15% over LRP," which stated, in pertinent part, "***[e]xpect [EP] to durably outpace market, capture share and aim to achieve leading market position***."

207. Defendants' statements in ¶¶198-206 were materially false and misleading when made for the reasons set forth in ¶¶187, 194. In addition, Defendants failed to disclose the following adverse facts, which were known to or recklessly disregarded by them: by fall 2025, senior management stated at internal meetings that the Company was losing PFA market share due to increasing competition. Additionally, the number of accounts taken by Affera continued to increase in fall 2025.

208. Securities analysts reacted favorably to Defendants' statements during the 2025 Investor Day Conference. On September 30, 2025, analysts at Citi published a report titled, *Relentless Innovation, Enduring Growth*, in which they noted that the 2025 Investor Day Conference "exceeded expectations," during which the Company "underscore[ed] a very healthy pipeline," with "[m]anagement expect[ing] to 'durably outpace' market growth, driven primarily by capturing share with an aspiration to achieve the leading market position," pointing to FARAPULSE. Citi analysts further wrote that, "[a]s the Farapulse system proliferates,

management is also leaning heavily into its mapping and diagnostic capabilities." That same day, analysts at TD Cowen also published a report titled, *Investor Day Fulfills Lofty Expectations; Guidance Reiteration Signals Solid Q3*, in which they highlighted Defendants' statements and reported that, "[o]f note, BSX spoke confidently about its outlook in PFA and EP despite increasing competition as rival PFA systems launch."

**E. October 22, 2025: Q3 2025 Financial Results**

209. On October 22, 2025, before the market opened, Boston Scientific announced its third quarter financial results in a press release filed on Form 8-K with the SEC ("Q3 2025 Press Release"). The Q3 2025 Press Release reported that, in the third quarter, organic net sales grew 15.3% compared to the prior year, exceeding the high end of the guidance range of 12% to 14%, and highlighted that Boston Scientific was raising guidance for FY2025 organic net sales growth to 15.5%.

210. That same day, October 22, 2025, Defendants Mahoney, Monson, and Stein, among others, participated in Boston Scientific's earnings call to discuss the Company's third quarter 2025 financial results ("Q3 2025 Earnings Call"). During the Q3 2025 Earnings Call, Defendant Mahoney articulated Boston Scientific's expectations for continued growth in the U.S. EP business unit:

> Looking forward, our aim is to grow -- continue to grow our share in the overall EP market, and ***we expect to retain a strong leadership position in PFA, enabled by our innovative portfolio, expanding mapping and commercial resources and consistent data publications.*** We expect global PFA penetration to continue to expand and to exit 2025 at 50% penetration and grow to approximately 80% by 2028.

211. During the question-and-answer segment of the Q3 2025 Earnings Call, Defendant Mahoney stated in response to an analyst's question:

> ***So much of the attention goes to our EP business and it should, given that we were just #4, now we're a clear #2 and have higher aim over the future.*** But as

> you said, it's not going to grow as fast as it has given that we're anniversarying comps and the size of the business, ***but we expect it to be an outstanding performer in '26 and beyond in our EP business***."

212. Additionally, on the Q3 2025 Earnings Call, in response to an analyst's question, Defendant Mahoney stated that "***we're still remarkably early in the PFA journey***."

213. The Q3 2025 Earnings Call featured a slideshow presentation, which was published on the investor relations page of the Company's website ("Q3 2025 Presentation"). The Q3 2025 Presentation included a slide titled "Cardiovascular Performance Summary," which stated, in pertinent part, that EP "***[g]rowth [was] led by FARAPULSE and supported by ramping adoption of the OPAL HDx mapping system***."

214. Defendants' statements in ¶¶210-13 were materially false and misleading when made for the reasons set forth in ¶¶187, 194, 207.

215. Securities analysts reacted favorably to Defendants' statements on the Q3 2025 Earnings Call. In an October 22, 2025 report, Citi analysts echoed Defendants statements that "Boston Scientific remains 'remarkably early' in the PFA journey" and noted that "continued momentum was again driven by global adoption of Farapulse and the ramping adoption of the Opal mapping system, driving share gains." In another October 22, 2025 report, UBS reported that, "[u]nsurprisingly, PFA/FARAPULSE saw another quarter of outperformance with EP sales of $865M," noting that "management commentary was supportive of our view that PFA is accelerating overall EP market growth and BSX continues to gain share." UBS further reported that there was "[m]omentum across key growth areas that not only isn't slowing but is actually building, all despite increasing competition (for FARAPULSE in EP)." Additionally, Canaccord Genuity reported on October 22, 2025 that, in the U.S., the Company "saw double-digit growth in Farapulse," and that "BSX is also continuing to aim to be the market leader in EP."

### F. <u>November 3, 2025</u>: Q3 2025 Form 10-Q

216. On November 3, 2025, before the market opened, Boston Scientific filed its quarterly report for Q3 2025 on Form 10-Q with the SEC (the "Q3 2025 10-Q"), accompanied by SOX Certifications signed by Defendants Mahoney and Monson. The Q3 2025 10-Q incorporated by reference the risk disclosures in Boston Scientific's 2024 10-K, as stated in ¶196.

217. Defendants' statements at ¶216 *hypothetically* warned that new products developed by other companies *may* make Boston Scientific's product "less competitive," *may* "impact [the Company's] net sales, and *may* "result in declines in [the Company's] market share and have an adverse impact" on the business. These statements were materially misleading for the reasons stated in ¶¶187, 194, 207. In particular, Defendants failed to disclose that, even before the Class Period: (i) competitors such as Medtronic were gaining significant traction in the U.S. PFA market; (ii) hospitals told Boston Scientific employees that they were using FARAPULSE only as a holdover device and abandoning it once competing systems received FDA approval; and (iii) customers had directly told Defendants they preferred Affera over FARAPULSE.

### G. <u>November 18, 2025</u>: Wolfe Research Healthcare Conference

218. On November 18, 2025, Defendant Stein participated in the Wolfe Research Healthcare Conference. During the conference, a Wolfe Research analyst asked Defendant Stein about OPAL: "Boston hasn't had much share, if any, in mapping to large incumbents that holding on and navigating the shift to PF on the ablation catheter side for now. Why will OPAL win now?" Defendant Stein responded: "***I think OPAL is becoming an incredibly competitive system, and it does offer some unique advantages versus either [of] the incumbent mapping systems***."

219. Additionally, during the Wolfe Research Healthcare Conference, an analyst asked Defendant Stein about "PFA competition":

> Michael K. Polark [Wolfe Research]: I want to ask on PFA competition. . . . How do you see their best product coexisting with your portfolio in the market? I mean is it the lines are well drawn and defined, and this is a major rising tide and there was room for more than just one player to participate? Or do you find that -- it is incremental tension for FARAPULSE's ability to continue gaining share?
>
> Kenneth M. Stein: Yes. I think – first off, rising tide does lift all boats, and ***the AF epidemic is so huge and ablation today is so underpenetrated. The market growth itself is a really important driver for us.*** And in some ways, maybe more important than share. I'd also say their use case right now is very different than FARAWAVE. It's still a point by point ablation paradigm, which is, frankly, it's tedious, more expensive procedure. Where they're seeing a niche today is in the redo cases. ***We think we've got a very compelling competitive offering when it comes to redos***. But if I got to win somewhere, I'd much rather win in the much bigger market, which is de novo ablations.

220. Defendants' statements in ¶¶218-19 were materially false and misleading when made for the reasons set forth in ¶¶187, 194, 207.

### H. <u>December 2, 2025</u>: Citi Annual Global Healthcare Conference

221. On December 2, 2025, Defendant Fitzgerald participated in the Citi Annual Global Healthcare Conference 2025. During the conference, Citi analyst Joanne Karen Wuensch asked Defendant Fitzgerald to give a "state of the union" on the EP business unit; Fitzgerald replied, in part, that "***we're growing, as you've seen in our numbers to date, probably 2x the market, driven by the ecosystem that is everything around FARAPULSE***," and that "***our ecosystem around the FARAPULSE system will continue to increase over the next few years***."

222. Citi analyst Wuensch then asked Defendant Fitzgerald about the "changing competitive landscape" in EP, to which he responded:

> ***Yes. I mean, surprise, surprise, everything in cardiology has multiple competitors, and it's highly competitive. That's -- it's been that same way for the 35 years I've been in cardio. So that's kind of par for the course, right?*** So we have -- the good news in a PMA-driven market is you tend not to get surprised. So you can see what's happening in the CE Mark trials. You can see what's happening in IDE approval studies in the U.S. So suffice it to say, I think we have a very good understanding of what competition we will face and in what time frame.

223. Defendants' statements in ¶¶221-22 were materially false and misleading when made for the reasons set forth in ¶¶187, 194, 207.

224. Securities analysts reacted favorably to Defendants' statements made during the Citi Annual Global Healthcare Conference. On December 2, 2025, Citi reiterated Defendants' false assurances, stating: "management estimates it has grown ~2x the market since launching Farapulse in the U.S., driven by the ecosystem that is 'everything around Farapulse,' including the catheter, mapping integration with Opal, and global indications." Citi further reported that management "highlighted that the pace and magnitude of PFA penetration is closely aligned with the technology and approvals and expects the recent persistent AF approval in the U.S. and other markets to 'juice' additional penetration."

### I. January 13, 2026: J.P. Morgan Healthcare Conference

225. On January 13, 2026, Defendants Mahoney and Stein participated in the 44th Annual JPM Healthcare Conference. During the conference, Defendant Mahoney touted Boston Scientific's PFA leadership position:

> ***I think we're in a great position***. ***We -- so I think just the continued progress and momentum and establishment and credibility of our team that continues to grow***. And so '25, we'll give the results in a few weeks here, but ***our EP business did extremely well. Clearly, the PFA market share leader. The market is undoubtedly the fastest-growing market in med tech.*** In '25, the market was well in this 20% growth range, and ***we predict a very, very healthy, a minimum of 15% plus over the next 3 years. So the market itself is growing quite quickly, much of it due to Pulsed Field Ablation and our leadership in that area.***
>
> * * * *
>
> [W]e have a strong cadence of products in addition to FARAPULSE to round out the portfolio to serve our physicians better. . . . ***So, we have a tremendous confidence in the market growth, our leadership position, and most importantly, as it will be a competitive market for many years to come, the internal execution on our product pipeline and our people development.***

226. During the 44th Annual JPM Healthcare Conference, in response to an analyst question inquiring about "how much of a competitive advantage" it is to have "the leading LAAC," Defendant Mahoney stated, "***[i]t's [] huge*** . . . ***but just from our business, you have the leading market share product with PFA with all the ecosystem we're building around it*** . . . ."

227. Additionally, during the 44th Annual JPM Healthcare Conference, Defendants also were asked about "third-party data sets . . . showing not the best sales growth for Boston Scientific and EP in the fourth quarter," to which Defendant Mahoney stated "***[w]e are comfortable where we finished the year***." Mahoney further stated that "***[w]e're pretty consistent about hitting – we're really consistent about hitting our guidance numbers and our company executes at a pretty high level. So there's lots of data that seems to run around that people get all antsy about. But I think we're pretty good at delivering on our commitments.***"

228. Defendants' statements in ¶¶225-27 were materially false and misleading when made for the reasons set forth in ¶¶187, 194, 207.

229. Securities analysts reacted favorably to Defendants' statements made during the 44th Annual J.P. Morgan Healthcare Conference. On January 13, 2026, Deutsche Bank reiterated Defendants' false assurances from the conference, stating: "Management's outlook for 2026 and LRP period through 2028, as outlined at the investor day last September, remains firmly intact. In terms of third-party data pointing to some overall volume softness in December, management expressed confidence in quarterly performance relative to guidance." Citi likewise reported on January 13, 2026 that "management provided incremental color on the electrophysiology market, which grew 20%+ in 2025 and predicted to grow 15% over the next three years. Despite some softer third-party data, management remains comfortable with its 4Q25 EP performance, highlighting drivers of growth." J.P. Morgan reported its takeaways from the conference on

January 13, 2026, stating that they believe "the quarter will be good, both overall and with a beat in EP and Watchman, with no negative impact in volumes since AHA" and that they "continue to expect robust growth in Electrophysiology." On January 14, 2026, analysts at RBC Capital Markets reported that "BSX presented a positive outlook this week" and that "[o]n the intra-quarter third party data that contributed to recent pull back in the stock price, CEO, Mike Mahoney specifically noted that they have been 'pretty consistent' in hitting their targets, including those set during the last four investor days and annual guidance." RBC further stated that "[t]he company executes at a 'pretty high level' and they remain confident in the numbers laid out."

## IX. THE TRUTH IS REVEALED

230. After repeatedly assuring investors throughout the Class Period that the Company would continue to take share in the broader EP market and dismissing concerns of competitive erosion, Defendants were forced to admit that EP growth had significantly slowed, that the Company had been losing PFA market share, and that further market share losses were expected throughout 2026.

231. On February 4, 2026, before the market opened, Boston Scientific filed a press release with the SEC on Form 8-K, announcing the Company's fourth quarter and full year 2025 financial results. In the accompanying Q4 2025 Financial and Operational Highlights presentation, Boston Scientific revealed that U.S. EP revenue was only $606 million in the fourth quarter—down from $607 million in the third quarter—meaning that the Company's principal growth engine had ceased growing. The Company simultaneously issued guidance for the first quarter and full year 2026 that fell below analysts' growth expectations, including first quarter organic net sales growth guidance of 8.5% to 10% and full year organic net sales growth guidance of 10% to 11%—a step-down from the 15.8% full year organic net sales growth that the Company had just delivered for FY 2025.

232. That same day, on February 4, 2026, the Company held its earnings call for the fourth quarter of fiscal year 2025 ("Q4 2025 Earnings Call"), where it was revealed that Boston Scientific's EP business had materially slowed, with U.S. EP sales flat on a sequential basis from the third quarter.

233. During the question-and-answer segment of the Q4 2025 Earnings Call, an analyst stated U.S. EP was flat sequentially and questioned whether "something [ ] changed late in the quarter because [Defendants] were pretty bullish at some December meetings with investors." Defendant Mahoney responded, in part, that Boston Scientific had "**planned and [ ] expect to lose**"[6] market share in the EP business unit, despite the Company's previous assurances:

> **When you're the highest market share leader in PFA and competitors are coming out, we planned and we do expect to lose some share given the competitive launches that are coming out and given our really dominant market share position going into 2025. So we did anticipate that.**

234. Defendant Mahoney then admitted that the Company anticipated the market share loss, stating: "**with new entrants coming, it's not surprising that we lost some share**."

235. During the question-and-answer segment of the Q4 2025 Earnings Call, Defendants received a flurry of questions about the weaker than expected performance in U.S. EP and WATCHMAN. For example, an analyst asked "the question that's on everybody's mind today" relating to Boston Scientific's two "key growth drivers":

> Robert Justin Marcus [J.P. Morgan]: I'll ask the question that's on everybody's mind today. Mike [Mahoney], there were fears that U.S. EP and U.S. WATCHMAN could come in soft, and U.S. EP was flat with third quarter. U.S. WATCHMAN missed by a hair. What exactly happened in the quarter versus your expectations versus the market? And the reason people are concerned is these are 2 of the key growth drivers. So you talked about confidence in above 15% EP growth next year of the market. The Street is sitting at around 25%. It feels like that needs to come down. Hopefully, you could help us level set expectations for those 2 key products, what happened in the quarter and how to think about them in '26?

---

[6] Statements in **bold and underlined** provided corrective information to the market.

> Michael F. Mahoney: . . . The 2 businesses that you called out, I think you nailed it. If you look at EP, we're quite pleased. **Actually, our results in Q4 exceeded our internal target**. . . .
>
> * * * *
>
> **The U.S. is more highly penetrated with PFA**. There's actually more competitors present outside the U.S., and we've accelerated growth outside the U.S. So our PFA performance is quite strong. The market is still healthy. We think it's 18% to 20% in the fourth quarter. . . .

236. During the question-and-answer segment, Defendant Mahoney admitted that Boston Scientific expected further market share reduction and to eventually hold "**equal**" share with its competitors:

> Frederick Allen Wise [Stifel, Nicolaus & Co.]: I hate to stick with EP, but looking at the EP discussion from another angle, maybe talk us through your expectations for how the '25 (sic) [ '26 ] year is going to unfold, maybe the cadence of the year, specifically relating to better understanding the growth acceleration that seems likely to occur as the quarters progress, helped by your innovation pipeline. And so maybe you can drill down further into what are the implications of FARAPOINT and talk to us again about the ancillary products like ICE catheter, et cetera. And maybe any updates on the FARAFLEX timing. So we better understand how -- again, the cadence of '25 and the setup as we head into -- I'm sorry, for '26 and the setup for '27.
>
> Michael F. Mahoney: Sure. I guess as we exit '25, **we're kind of in a, what, 65-ish percent PFA market share position**. We have a market that we think is going to grow 15%. We have high utilization in the U.S., call it, 80% -- 70%, 80% and outside the U.S., quite a bit lower. So with a healthy market, we expect to continue to grow above market. **Our PFA share will reduce somewhat, but we're very confident by year-end, likely if you add all the other competitors together, our share will be equal to them or in that area.** We're not going to break out share by quarter, but we're very confident that we'll maintain clear market leadership in PFA over the course of 2026 and beyond.

237. Defendants also disclosed that the PFA growth runway in the U.S. was substantially more mature than investors had been led to believe, with Defendants estimating that approximately 70% of U.S. AFib ablations had already converted to PFA. Defendant Stein explained that after approximately "3 years into the launch of FARAPULSE in the U.S.," the procedure-efficiency gains associated with FARAPULSE were "**largely now built into the system**," and that

Defendants therefore viewed approximately 15% as a realistic estimate of EP market growth for 2026—not the approximately 25% reflected in market expectations.

238. On this news, the price of Boston Scientific stock plummeted, falling from a closing price of $91.62 per share on February 3, 2026 to $75.50 per share on February 4, 2026—a 17.6% decline, on unusually high trading volume, wiping out approximately $23.9 billion in market capitalization, in the span of a single day.

239. Securities analysts were shocked by the Company's disclosures. For example, a February 4, 2026 report by Truist Securities stated that "all eyes were on US EP results," and that those results "ended up missing by a bigger amount vs. feared ($45M miss vs. what we suspect was willingness to tolerate something more like ~$20-$25M shortfall)." Significantly, Truist Securities expected the stock to react "mostly to the EP result" "**especially coming off mgmt. commentary a few weeks ago (or at least the opportunity to offer more color on EP trends**) at an investor conference and during the Penumbra [ ] transaction conference call." The report further stated that "the steeper than expected q/q deceleration in US EP growth (31% in 4Q25, 66% in 3Q25, 94% in 2Q25) reflects a mix of BSX anniversarying the steepest part of its penetration curve as competition from MDT [ ] and potl. other players (JNJ [ ] and ABT [ ]) intensifies."

240. Other analysts similarly noted that Boston Scientific management had the opportunity to address the market share loss prior to the Q4 2025 Earnings Call but failed to do so. For example:

a. Deutsche Bank reported on February 4, 2026 that "BSX was off 17% today as all the fears over the past 60 days about Farapulse losing share / market slowing have been proven true," and that "**[p]art of the aggressive selling today was**

**natural as management was dismissive of Yipet data at conferences in December and then again in early January, however the dataset was proven correct**.” Deutsche Bank further described that “confidence in management took a hit which was partly why the sell-off today was so dramatic.”

b. Bernstein reported on February 5, 2026 that “**[i]nvestors have been worried about intensifying PFA competition, and third-party data stoked anxieties that BSX could miss in Q4**,” and that **“BSX’s CEO tried to calm concerns last month, but alas, Q4 U.S. EP sales of $606mn were flat sequentially and missed consensus ($643mn) by 6%**.” Most damningly, Bernstein noted that “**[s]ome investors questioned management credibility**.”

241. Additional analysts reported their dismay with Boston Scientific’s results:

a. Raymond James reported on February 4, 2026 that, “[w]hile BSX beat 4Q revenue and EPS, the revenue beat was its smallest in three years and BSX missed consensus in its two biggest growth drivers, EP and Watchman.”

b. Barclays reported on February 5, 2026 that the “sharp drop in the stock” was triggered by “Q4 U.S. EP sales [coming] up short of consensus.” Barclays noted that “EP was up 35%, but $35 mil below consensus.”

c. UBS reported on February 5, 2026 that Boston Scientific’s results “add[ed] fuel to the fire that has been investor concerns surrounding a potential growth cliff in two of BSX’s critical growth areas (EP and WATCHMAN),” and noted that “[o]bviously some share loss is impacting BSX in US EP.”

d. Goldman Sachs reported on February 5, 2026 that "this is the first quarter over the past two years when the [C]ompany has not posted more meaningful top- and bottom-line upside vs. consensus, with key growth drivers (EP and WATCHMAN) decelerating at a greater pace than expected." Additionally, the report highlighted that "BSX was generally viewed as an exception to the broader industry concerns weighing on peers, but the 4Q results and 2026 guidance remind that at over $20 billion in annual revenue, Boston Scientific cannot sustain top tier growth on the heels of two product categories."

e. Evercore reported on February 6, 2026 that, "[w]e were wrong...we had thought that US EP revs would be fine . . . . EP missed and drove one of the single largest declines on growth slowdown fears."

## X. ADDITIONAL ALLEGATIONS OF SCIENTER

242. As alleged herein, Defendants acted with scienter throughout the Class Period, in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued or disseminated in the name of the Company, or in their own names, were materially false and misleading when made; Defendants knew, or recklessly disregarded, that such statements or documents would be issued or disseminated to the investing public; and Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants—by virtue of their receipt of or access to information reflecting the true facts regarding Boston Scientific, their control over, or receipt, and/or modification of Boston Scientific's allegedly misleading misstatements and omissions—were active and culpable participants in the fraudulent scheme alleged herein.

243. Defendants knew, or recklessly disregarded, the false and misleading nature of the information that they caused to be disseminated to the investing public. The fraud alleged herein

could not have been perpetrated throughout the Class Period without the knowledge and complicity, or at least the reckless disregard, of Boston Scientific personnel at the highest levels of the Company.

244. The Individual Defendants permitted Boston Scientific to release false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated and/or artificially maintained the price of Boston Scientific common stock during the Class Period.

245. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Boston Scientific common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The fraudulent scheme deceived the investing public regarding Boston Scientific's business, operations, and management, as well as the intrinsic value of Boston Scientific's common stock, and caused Plaintiffs and members of the Class to purchase Boston Scientific common stock at artificially inflated and/or artificially maintained prices.

246. The following allegations support a strong inference of scienter:

a. statements by Former Employees corroborate that Defendants knew, or recklessly disregarded, the falsity of their statements and omissions during the Class Period, at the time such statements were made;

b. Defendant Mahoney's suspiciously timed stock sale just two days before the alleged corrective disclosure;

c. Defendants' repeated statements touting their confidence that Boston Scientific's EP business unit would continue its strong growth and its PFA offerings were insulated from competitive pressures; and

d. the EP business unit was at the core of Boston Scientific's business and growth, and the Individual Defendants spoke frequently about its importance.

**A. Statements by Former Employees Corroborate That Defendants Knew or Recklessly Disregarded the Falsity of Their Statements and Omissions at the Time Such Statements Were Made**

247. The Former Employee accounts detailed above in Section VI provide factual support for the falsity of Defendants' material misstatements and omissions and for a strong inference of scienter on Defendants' part regarding the false and misleading nature of their statements and omissions during the Class Period.

248. Among other things, and as more specifically stated in Section VI, the allegations from the Former Employees detail that:

a. Boston Scientific tracked which hospitals switched from FARAPULSE to Affera and this information was shown to Company executives;

b. FE-8 stated he met with Defendant Spadea-Anello from 2023 to mid-to-late 2024. FE-8 explained that he told Spadea-Anello that FARAPULSE was losing market share to Affera during their meetings;

c. FE-8 also met with Defendant Spadea-Anello monthly and quarterly in 2024 and 2025. FE-8 recalled that he expressed concerns about PFA competition during his meetings with Spadea-Anello, but Spadea-Anello dismissed those concerns;

d. During internal strategy meetings, which senior leaders, including Shawn Burke, Defendant Fitzgerald, and Defendant Spadea-Anello attended, it was discussed that Boston Scientific expected to lose 20 PFA market share points across the U.S. to Medtronic in the first 12 months after Affera was launched, and Defendant Mahoney was aware of this projection;

e. During Quarterly Sales Meetings with sales leaders, including Shawn Burke, Sam Conaway, Defendant Fitzgerald, and Defendant Spadea-Anello, sales leaders were told, among other things, that customers did not want OPAL and preferred Affera over FARAPULSE;

f. Defendant Spadea-Anello gave FE-9 direction as to Defendant Mahoney and EVP Butcher's agenda for the 2024 HRS meeting. According to FE-9, Defendant Spadea-Anello wanted Defendant Mahoney and EVP Butcher to attend sessions at the 2024 HRS meeting to learn more about and get exposure to Affera and Sphere-9 because Affera posed the biggest threat to FARAPULSE;

g. Defendant Mahoney and EVP Butcher both sat in sessions to learn more about Affera and attended an Affera late breaking clinical trial at the 2024 HRS meeting;

h. FE-9 was in charge of creating Defendant Mahoney and EVP Butcher's agenda for the 2025 HRS meeting. FE-9 noted that the emphasis for their agenda was Medtronic because it was the Company's largest threat;

i. At the 2025 HRS meeting, customers expressed their concerns to Defendant Mahoney, Defendant Fitzgerald, and Shawn Burke, specifically stating that they did not want Boston Scientific's mapping system or catheter portfolio and that they preferred Affera over FARAPULSE;

j. Area vice presidents were informed that FARAPULSE was losing market share to Affera, and according to one former employee, this information was reported to Defendant Mahoney;

k. Members of the C-Suite attended national sales meetings that occurred once a year, including Defendant Mahoney, Defendant Spadea-Anello, and Sam Conaway. At these meetings, there were breakout sessions and presentations about competition;

l. Defendant Mahoney was "very much in the know" regarding Boston Scientific losing PFA market share to Affera based on the Company's reporting structure;

m. At the end of 2024, when Affera first launched, Company executives admitted at a meeting that Medtronic sold twice as many Affera systems in 2024 as Boston Scientific projected it would;

n. During impromptu national sales calls, Shawn Burke and Matt Risinger told salespeople in early summer 2025 that Boston Scientific was losing "significant" PFA market share nationwide to Medtronic. Burke and Risinger continued to tell salespeople during these calls throughout 2025 that Boston Scientific was losing "significant" PFA market share nationwide to both Medtronic and J&J; and

o. At Boston Scientific's National Sales meeting and a Cardiology group meeting, both attended by Sam Conaway and Defendant Fitzgerald, AFib regional sales directors discussed how FARAPULSE was losing market share to Medtronic's PFA system Affera and stated that they expected to lose additional PFA market share to VARIPULSE.

**B. Defendant Mahoney's Suspiciously Timed Stock Sale Two Days Before the Alleged Corrective Disclosure**

249. Defendant Mahoney's sale of Boston Scientific stock two days before the February 4, 2026 disclosure supports a strong inference of scienter. Notably, Defendant

Mahoney's Rule 10b5-1 trading plan does not negate scienter, as that plan was entered into during the Class Period when Mahoney was already in possession of MNPI.

### 1. Defendant Mahoney's February 2, 2026 Sale Was Suspiciously Timed and Executed Two Days Before the Corrective Disclosure

250. Defendant Mahoney's February 2, 2026 sale of 160,901 shares for proceeds of approximately $15 million was suspiciously timed: the sale occurred two days before the corrective disclosure (on February 4, 2026) when the Company revealed that its EP business had slowed materially, that U.S. EP sales had flattened, and that FARAPULSE had already lost PFA market share, with further declines expected in 2026. Following this disclosure, Boston Scientific's stock price fell from $91.62 per share on February 3, 2026 to $75.50 per share on February 4, 2026, ***a decline of approximately 17.6%, on unusually high trading volume, wiping out approximately $23.9 billion in market capitalization in a single day***, representing its largest single-day decline since July 2000.

251. The timing of Defendant Mahoney's sale is particularly suspicious because, by February 2, 2026, Boston Scientific's fourth quarter and full-year 2025 results were already known to Defendants. Indeed, on January 13, 2026 (just three weeks before this sale), Defendant Mahoney had dismissed third-party data showing weaker EP sales and slowing procedure volumes, characterizing investors as "antsy" and stating the Company was "comfortable" with its year-end performance, while privately possessing data demonstrating that FARAPULSE's growth was decelerating.

252. Through this transaction, Defendant Mahoney disposed of over 10% of his direct holdings of Boston Scientific stock. Had Mahoney waited two days to sell his shares at the post-disclosure closing price of $75.50, his proceeds would have been reduced by approximately

$2.9 million. Mahoney thus avoided substantial losses by selling immediately before the truth was revealed to investors.

### 2. Defendant Mahoney's Trading Plan Was Adopted During the Class Period, Undermining Its Protective Value

253. Although Defendant Mahoney's February 2, 2026 sale was made pursuant to a prearranged Rule 10b5-1 trading plan, such plans provide protection only when adopted before an executive possesses MNPI. Here, Mahoney adopted his trading plan in August 2025 (during the Class Period), undermining any inference that the trades were pre-scheduled in good faith.

254. SEC Rule 10b5-1 (17 C.F.R. § 240.10b5-1) provides that a person will be deemed to have traded "on the basis of material nonpublic information" if the person engaging in the transaction was "aware of" that information at the time of the trade. To provide a safe harbor under the "aware of" standard, the SEC created an affirmative defense to insider trading claims for trades made pursuant to a binding agreement or plan ("10b5-1 Plans" or "Plans"). *See Selective Disclosure & Insider Trading*, 65 Fed. Reg. 51716, at 51727-28 (Aug. 24, 2000). Pursuant to SEC Rule 10b5-1(c), a 10b5-1 Plan is a defense to insider trading liability only if it is entered into by an insider "[b]efore becoming aware" of inside information and was established "in good faith and not as part of a plan or scheme to evade the prohibitions" against insider trading.

255. Because of this, insiders are advised to "design a trading plan with the intention that it will not be modified or amended frequently, since changes to the plan will raise issues as to a person's good faith." Thomson Reuters, *Corporate Counsel's Guide to Insider Trading & Reporting*, Ch. 12:26 (2018). Conversely, the adoption and/or modification of 10b5-1 Plans while in possession of MNPI is highly suspicious and supports a strong inference of scienter.

256. Although Defendant Mahoney's stock sale was made pursuant to a 10b5-1 Plan, the circumstances of the sale are sufficiently suspicious to overwhelm any exculpatory inference

that might otherwise have been available to a pre-planned sale based on such Plan. Indeed, such Plans are under heavy SEC scrutiny in light of a *Wall Street Journal* investigation that found that insiders who were trading pursuant to 10b5-1 Plans were trading at opportune times and reaping better-than-expected results. According to the November 27, 2012 *Wall Street Journal* article, titled, "Executives' Good Luck in Trading Own Stock," executives trading pursuant to 10b5-1 Plans are still able to time their trades to avoid losses and increase earnings because trading plans are not public and can be canceled or amended at any time without disclosure.

257. By August 2025, Defendant Mahoney was already in possession of MNPI concerning the deterioration of Boston Scientific's EP business, including: (i) competitors such as Medtronic were gaining significant traction in the U.S. PFA market; (ii) physicians and hospitals were using FARAPULSE only as a holdover device and abandoning it once competing systems received FDA approval; and (iii) customers had directly told Defendants they preferred Affera over FARAPULSE.

258. Accordingly, the trading behavior of Defendant Mahoney during the Class Period raises a strong inference of suspicious and unusual trading activity, and his trading Plan does not provide him with safe harbor.

### C. Defendants Repeated Statements Touting Their Confidence That Boston Scientific's EP Business Unit Would Continue Its Strong Growth, and That Its PFA Offerings Were Insulated from Competitive Pressures

259. During the Class Period, the Individual Defendants repeatedly touted their confidence that Boston Scientific's EP business unit would continue its strong growth, and that its PFA offerings were insulated from competitive pressures. Given the specificity and frequency of these statements, Defendants either knew their statements were false or acted with reckless disregard for the truth. For example:

a. On September 30, 2025, Defendant Mahoney stated, "***our confidence in it, and I think Nick [Spadea-Anello] did a great job on his slide, it's FARAWAVE, the FARAPOINT, the OPAL, it's the ecosystem that Nick [Spadea-Anello] talked about, which is super important to understand that***."

b. On September 30, 2025, Defendant Spadea-Anello stated, "***we're insulating ourselves by having an entire ecosystem tied to our mapping system. And we know that the hard way because we lost when it came to RF and tying it together. We learned the hard way when it comes to now having a new energy modality where we're leading and leading big to capitalize on that and capitalize on that in a big way***."

c. On October 22, 2025, Defendant Mahoney stated, "***we expect to retain a strong leadership position in PFA, enabled by our innovative portfolio, expanding mapping and commercial resources and consistent data publications***."

d. On November 18, 2025, Defendant Stein stated, "***the AF epidemic is so huge and ablation today is so underpenetrated. The market growth itself is a really important driver for us***," and "***[w]e think we've got a very compelling competitive offering when it comes to redos***."

e. On December 2, 2025, Defendant Fitzgerald stated, "***we're growing, as you've seen in our numbers to date, probably 2x the market, driven by the ecosystem that is everything around FARAPULSE***" and that "***our ecosystem around the FARAPULSE system will continue to increase over the next few years***."

f. On December 2, 2025, Defendant Fitzgerald stated, "I think we have a very good understanding of what competition we will face and in what time frame."

g. On January 13, 2026, Defendant Mahoney stated, "***we have a tremendous confidence in the market growth, our leadership position and most importantly, as it will be a competitive market for many years to come, the internal execution on our product pipeline and our people development***."

### D. The EP Business Unit Was at the Core of Boston Scientific's Business, and the Individual Defendants Spoke Frequently About Its Importance

260. Boston Scientific's EP business unit—and FARAPULSE in particular—was the single most important growth driver of the Company's business throughout the Class Period and was therefore a subject about which the Individual Defendants were intimately informed. Indeed, the Individual Defendants repeatedly spoke to investors about the EP business unit's performance, competitive positioning, and centrality to Boston Scientific's financial results.

261. Cardiovascular—the segment within which FARAPULSE resided—was Boston Scientific's primary growth engine, with organic net sales growing approximately 22% from $8.82 billion in 2023 to $10.76 billion in 2024, and approximately 23% from $10.76 billion in 2024 to $13.25 billion in 2025, more than three times the organic net sales growth rate of the Company's MedSurg segment. Within Cardiovascular, Defendants described the EP market as a "$13 billion market, largest in medtech and the fastest growing in medtech." EP revenue grew from $800 million in fiscal year 2023 to $1.904 billion in fiscal year 2024, to $3.325 billion in fiscal year 2025—more than quadrupling in two years. U.S. EP revenue grew even more dramatically, from $370 million in 2023, to $1.256 billion in 2024, to $2.311 billion in 2025. The EP business unit accounted for more than 43.3% of Boston Scientific's total revenue growth between 2023 and 2025, making it the Company's largest growth driver during that period.

262. Defendants repeatedly confirmed that the EP business unit—including its flagship FARAPULSE product—was core to the Company's financial performance. In its public filings,

the Company acknowledged that Cardiovascular segment growth in 2024 and 2025 was "primarily driven" by growth in the EP business unit, led by FARAPULSE. Additionally, in every quarterly earnings presentation during the Class Period, the Company included information underscoring the EP business unit's contribution to overall Cardiovascular segment growth and highlighted its U.S. PFA market position.

263. Throughout the Class Period, the Individual Defendants repeatedly addressed the EP business unit's performance, competitive positioning, and growth trajectory in public statements to investors, demonstrating both their familiarity with the subject matter and the fact that EP's competitive dynamics were at the core of Boston Scientific's business. For example:

a. On May 28, 2025, Defendant Mahoney stated that "***we happen to have a very unique position in what I think I will call the 3 largest, highest growth markets in all of medtech, in the EP category***."

b. On September 30, 2025, Defendant Fitzgerald stated that "EP [is a] $13 billion market, largest in medtech and the fastest growing in medtech. So we see over the long-range plan, the EP market growing at 15% and . . . ***we're going to outpace the market. . . . [W]e will continue to take share in the broad EP market***."

c. On September 30, 2025, Defendant Spadea-Anello stated that "***FARAPULSE is the #1 PFA prescribed product across the world for electrophysiologists and we are going to deliver clear meaningful growth with this technology***."

d. On October 22, 2025, Defendant Mahoney stated that "***we expect [FARAPULSE] to be an outstanding performer in '26 and beyond in our EP business***"; and that "***we expect to retain a strong leadership position in PFA,***

***enabled by our innovative portfolio, expanding mapping and commercial resources and consistent data publications***."

e. On December 2, 2025, Defendant Fitzgerald stated that "***we're growing . . . probably 2x the market, driven by the ecosystem that is everything around FARAPULSE***."

f. On January 13, 2026, Defendant Mahoney stated that the Company's PFA business showed "***continued progress and momentum***," that the Company is "***[c]learly, the PFA market share leader***," and that "***[t]he market is undoubtedly the fastest-growing market in med tech***."

264. Given the core nature of the EP business unit, and FARAPULSE in particular, to Boston Scientific's business, there is a strong inference that Defendants either knew their statements concerning FARAPULSE and the EP business unit were false or acted with reckless disregard for the truth.

## XI. LOSS CAUSATION

265. Defendants' misstatements and omissions, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class. During the Class Period, Defendants made materially false and misleading statements and omissions and engaged in a scheme to defraud investors. Defendants' misstatements and omissions artificially inflated and/or artificially maintained the price of Boston Scientific common stock and operated as a fraud and deceit on the Class. Throughout the Class Period, Plaintiffs and the Class purchased Boston Scientific common stock at artificially inflated and/or artificially maintained prices and were damaged thereby when the price of that common stock declined or when the truth was revealed and/or the risks concealed by Defendants' misrepresentations and omissions materialized.

266. When Defendants' prior misrepresentations and fraudulent conduct were disclosed to investors, the price of Boston Scientific common stock dropped significantly, and investors incurred billions of dollars in losses.

267. As described above, Defendants' misrepresentations and omissions were revealed on February 4, 2026, when Defendants disclosed that the Company's EP business had slowed materially, with U.S. EP revenue flat on a sequential basis from the third quarter of 2025. Critically, Defendant Mahoney revealed that Boston Scientific had "planned" and "expect[ed] to lose" EP market share, admitted that "results in Q4 exceeded our internal target," and disclosed that the Company anticipated EP growth to further decelerate in 2026. On this news, the price of Boston Scientific stock fell from a closing price of $91.62 per share on February 3, 2026 to $75.50 per share on February 4, 2026—***a 17.6% decline, on unusually high trading volume, wiping out approximately $23.9 billion in market capitalization in the span of a single day***.

268. As a result of their purchases or acquisitions of Boston Scientific common stock at artificially inflated and/or artificially maintained prices during the Class Period, and the subsequent decline in Boston Scientific's stock price when the truth was revealed, Plaintiffs and Class members suffered actual economic losses, i.e., damages, under the federal securities laws.

## XII. CLASS ACTION ALLEGATIONS

269. Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons and entities who or which purchased or otherwise acquired Boston Scientific publicly traded common stock during the Class Period and were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Individual Defendant; (iii) any person who was an officer, director, and/or control person of Boston Scientific during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling or beneficial interest;

(v) Boston Scientific's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity, in their capacities as such.

270. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Boston Scientific's common stock was actively traded on the NYSE. As of October 30, 2025, Boston Scientific had 1,482,442,039 shares of common stock outstanding. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members of the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

271. Plaintiffs' claims are typical of the claims of the other members of the Class, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws complained of herein.

272. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation. Plaintiffs have no interests that conflict with those of the Class.

273. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

b. whether Defendants knew, or recklessly disregarded, that their statements and/or omissions were false and misleading;

c. whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders misrepresented material facts about the business, operations, and prospects of Boston Scientific;

d. whether statements made by Defendants to the investing public misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Boston Scientific;

e. whether the market price of Boston Scientific common stock during the Class Period was artificially inflated and/or artificially maintained due to the material misrepresentations and omissions complained of herein; and

f. the extent to which the members of the Class have sustained damages and the proper measure of damages.

274. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by certain individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## XIII. PRESUMPTION OF RELIANCE

275. At all relevant times, the market for the Company's common stock was an open, efficient, and well-developed market for the following reasons, among others:

a. Boston Scientific's stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

b. as a regulated issuer, Boston Scientific filed periodic reports with the SEC;

c. Boston Scientific regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. Boston Scientific was followed by numerous securities analysts employed by major brokerage firms, including Citi, Deutsche Bank, Piper Sandler, Bernstein, Goldman Sachs, and J.P. Morgan, who wrote reports that were distributed to those brokerage firms' sales force and certain customers—each of these reports was publicly available and entered the public marketplace.

276. As a result of the foregoing, the market for Boston Scientific's common stock reasonably and promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of the Company's common stock. Under these circumstances, all purchasers or acquirers of Boston Scientific common stock during the Class Period suffered similar injury through their purchase or acquisition of Boston Scientific common stock at artificially inflated and/or artificially maintained prices, and a presumption of reliance applies.

277. A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose materially adverse information regarding Boston Scientific's business and operations—information that Defendants were obligated to

disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the material misstatements and omissions set forth above, that requirement is satisfied here.

## XIV. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

278. The statutory safe harbor provided by the PSLRA (15 U.S.C. § 78u–5, the "Safe Harbor") or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

279. To the extent that the Safe Harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. Defendants are liable for the statements pleaded because, at the time each of those statements were made, Defendants knew the statements were false, and the statements were authorized and/or approved by an executive officer and/or director of Boston Scientific, who knew that such statements were false when made.

## XV. CLAIMS FOR RELIEF

**COUNT I**

**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5, Promulgated Thereunder, Against All Defendants**

280. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

281. This Count is asserted against all Defendants pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, promulgated thereunder, on behalf of Plaintiffs and the Class.

282. Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and/or artificially maintain the market price of Boston Scientific common stock; and (iii) cause Plaintiffs and other members of the Class to purchase Boston Scientific common stock at artificially inflated and/or artificially maintained prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

283. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers or acquirers of the Company's common stock, in an effort to inflate and/or maintain artificially high market prices for Boston Scientific common stock, in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5, promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons, as alleged below.

284. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Boston Scientific's business, operations, and prospects, as specified herein. Defendants employed devices, schemes, and artifices to defraud while in possession of materially adverse non-public information, and engaged in acts, practices, and a course of conduct, as alleged herein, in an effort to assure investors of Boston Scientific's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Boston Scientific and its business, operations, and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers or acquirers of the Company's common stock during the Class Period.

285. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to, and participated in, the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the

Company's dissemination of information to the investing public, which they knew, and/or recklessly disregarded, was materially false and misleading.

286. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Boston Scientific's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or artificially maintained price of Boston Scientific common stock. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations, and prospects, Defendants either had actual knowledge of the misrepresentations and/or omissions alleged or were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false and/or misleading.

287. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Boston Scientific common stock was artificially inflated and/or artificially maintained, and relying directly or indirectly on the false and/or misleading statements made by Defendants or upon the integrity of the market in which the stock trades, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants but not disclosed in public statements by Defendants, Plaintiffs and the other members of the Class purchased or acquired Boston Scientific common stock during the Class Period at artificially inflated and/or artificially maintained prices and were damaged thereby.

288. At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known of the truth regarding the problems that Boston Scientific was experiencing, which was not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or acquired Boston Scientific common stock, or, if they had purchased or acquired such common stock during the Class Period, they would not have done so at the artificially inflated and/or artificially maintained prices that they paid or received.

289. By virtue of the foregoing, Defendants each violated Section 10(b) of the Exchange Act and SEC Rule 10b-5, promulgated thereunder.

290. As a direct and proximate result of Defendants' wrongful conduct alleged herein, Plaintiffs and the other members of the Class suffered damages in connection with their purchases and acquisitions of the Company's common stock during the Class Period.

## COUNT II

## For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

291. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

292. This Count is asserted pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against the Individual Defendants on behalf of Plaintiffs and the Class.

293. The Individual Defendants acted as controlling persons of Boston Scientific within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did

influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and/or misleading. Each of the Individual Defendants was provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

294. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

295. As set forth above, Defendants each violated Section 10(b) and SEC Rule 10b-5, promulgated thereunder, by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases or acquisitions of the Company's common stock during the Class Period.

## COUNT III

## For Violation of Section 20A of the Exchange Act Against Defendant Mahoney

296. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

297. This claim is brought under Section 20A of the Exchange Act, 15 U.S.C. §78t-1, against Defendant Mahoney, on behalf of Plaintiffs and the Class.

298. The information provided to or possessed by Defendant Mahoney about FARAPULSE's first-mover advantage collapsing and competitors taking market share at an alarming rate (*see supra* Section VI) was material and non-public. In addition, Defendant Mahoney's conduct violated Boston Scientific's own Stock Trading Policy, which prohibits all directors, officers, and employees from trading when one is in possession of MNPI.

299. Defendant Mahoney obtained MNPI from Boston Scientific in the context of his role as an insider of the Company. Mahoney had a duty to disclose this information before trading or to refrain from trading.

300. While in possession of MNPI, on February 2, 2026, Defendant Mahoney sold 160,901 shares of Boston Scientific common stock, at an average value of approximately $94 per share, for a total value of $15 million.

301. By virtue of the foregoing, Defendant Mahoney, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly engaged in conduct that constituted a violation of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5, promulgated thereunder, 17 C.F.R. §240.10b-5.

302. Lead Plaintiff INPRS, Additional Named Plaintiff Miami FIPO, and members of the Class purchased Boston Scientific common stock without access to this MNPI. Plaintiff INPRS and members of the Class purchased Boston Scientific stock contemporaneously with Defendant Mahoney's sale of that stock on or around February 2, 2026.

303. By virtue of the foregoing, Defendant Mahoney is jointly and severally liable to Lead Plaintiff INPRS, Additional Named Plaintiff Miami FIPO, and the Class for his insider sales pursuant to Section 20A of the Exchange Act, 15 U.S.C. §78t-1.

304. When the material adverse information was revealed, Boston Scientific's stock price declined and investors suffered economic losses, i.e., damages.

305. Lead Plaintiff INPRS, Additional Named Plaintiff Miami FIPO, and members of the Class are therefore entitled to the measure of damages delineated under 15 U.S.C. §78t-1(b)(1).

## XVI. PRAYER FOR RELIEF

306. WHEREFORE, Plaintiffs pray for relief and judgment as follows:

a. Declaring this action to be a class action, certifying Plaintiffs as Class Representatives under Rule 23 of the Federal Rules of Civil Procedure, and designating Lead Counsel as Class Counsel;

b. Awarding damages and other remedies available under the Exchange Act in favor of Plaintiffs and all other members of the Class against Defendants, jointly and severally, including interest thereon;

c. Awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d. Awarding such other and further relief as this Court deems appropriate.

## XVII. JURY DEMAND

307. Plaintiffs demand a trial by jury.

Dated: July 20, 2026

Respectfully submitted,

**DONNELLY, CONROY, AND GELHAAR LLP**

*/s/ T. Christopher Donnelly*
T. Christopher Donnelly (BBO #129930)
Peter E. Gelhaar (BBO #188310)
Pietro A. Conte (BBO #707055)
260 Franklin Street, Suite 1600
Boston, MA 02110
Tel: (617) 720-2880
Fax: (617) 720-3554
tcd@dcglaw.com
peg@dcglaw.com
pac@dcglaw.com

***Liaison Counsel for Lead Plaintiff and Proposed Class***

**LABATON KELLER SUCHAROW LLP**
Christine M. Fox (admitted *pro hac vice*)
Emily N. Gault (admitted *pro hac vice*)
John C. Coyle IV (BBO #714121)
140 Broadway
New York, NY 10005
Tel.: (212) 907-0700
Fax: (212) 818-0477
cfox@labaton.com
egault@labaton.com
jcoyle@labaton.com

***Lead Counsel for Lead Plaintiff and Proposed Class***

**BLEICHMAR FONTI & AULD LLP**
George Bauer (*pro hac vice* forthcoming)
Nancy Kulesa (*pro hac vice* forthcoming)
75 Virginia Road
White Plains, NY 10603
Tel.: (212) 789-3602
gbauer@bfalaw.com
nkulesa@bfalaw.com

Erin Woods (*pro hac vice* forthcoming)
Thayne Stoddard (*pro hac vice* forthcoming)
300 Park Avenue, Suite 1301
New York, NY 10022
Tel.: (212) 789-1340
ewoods@bfalaw.com
tstoddard@bfalaw.com

***Counsel for Additional Named Plaintiffs Miami Fire Fighters and Police Officers' Retirement Trust and Detroit General Retirement System***

**KLAUSNER, KAUFMAN, JENSEN & LEVINSON**
Robert Klausner
7080 Northwest 4th Street
Plantation, Florida 33317
Tel: (954) 916-1202
Fax: (954) 916-1232
bob@robertdklausner.com

***Counsel for Additional Named Plaintiff Miami Fire Fighters' and Police Officers' Retirement Trust***

**VANOVERBEKE, MICHAUD & TIMMONY, P.C.**
Michael J. VanOverbeke
Thomas C. Michaud (*pro hac vice* forthcoming)
79 Alfred Street
Detroit, MI 48201
Tel: (313) 578-1200
mvanoverbeke@vmtlaw.com
tmichaud@vmtlaw.com

***Counsel for Additional Named Plaintiff Detroit General Retirement System***

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF (NEF) and paper copies will be sent to those indicated as non-registered participants on July 20, 2026.

*/s/ Pietro A. Conte*
Pietro A. Conte